**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ANNETTE LORBER,

                  Plaintiff,

            -against-

JONATHAN WINSTON, SHELDON M.
GANZ, SHELDON M. GANZ, CPA, P.C.,
EVA TEHRANI, HSBC BANK USA,
NATIONAL ASSOCIATION, HSBC
SECURITIES (USA) INC.,

                  Defendants.
--------------------------------------------------------X

**FILED**
**CLERK**

11/26/2012 10:47 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-3571 (ADS) (ETB)

<u>**APPEARANCES:**</u>

**Lowenstein Sandler PC**
*Attorneys for the plaintiff*
1251 Avenue of the Americas
New York, NY 10020
    By:  Ira Lee Sorkin, Esq.
          Savannah Stevenson, Esq.
          Nicole Pappas DeBello, Esq., Of Counsel

**Judd Burstein PC**
*Attorney for defendant Jonathan Winston*
1790 Broadway
Suite 1501
New York, NY 10019
    By:  Judd Burstein, Esq., Of Counsel

**Matalon Shweky Elman PLLC**
*Attorneys for the defendants Sheldon M. Ganz & Sheldon M. Ganz, CPA, PC*
450 7th Avenue 33rd Floor
New York, NY 10123
    By:  Howard I. Elman, Esq., Of Counsel

1

**Law Offices of Eric Franz PLLC**
*Attorney for defendant Eva Tehrani*
747 Third Avenue
20th Floor
New York, NY 10017
    By:  Eric P. Franz, Esq.
           Andrew Leopoldo Mancilla, Esq., Of Counsel

**Law Offices of Steven D. Isser**
*Attorney for defendant Eva Tehrani*
1359 Broadway
Suite 2001
New York, NY 10018
    By:  Steven David Isser, Esq., Of Counsel

**Sills Cummis & Gross P.C.**
*Attorneys for defendants HSBC Bank USA, National Association & HSBC Securities (USA) Inc.*
30 Rockefeller Plaza
New York, NY 100112
    By:  Jonathan Young, Esq.
           Andrew W. Schwartz, Esq., Of Counsel

## NO APPEARANCE

513 Central Park LLC (Relief Defendant)

**SPATT, District Judge**.

        On July 18, 2012, plaintiff Annette Lorber ("the Plaintiff") commenced this action by filing a Complaint against multiple defendants, which was thereafter reduced to the following: Jonathan Winston ("Winston"); Sheldon M. Ganz ("Ganz"); Sheldon M. Ganz, CPA, P.C.; Eva Tehrani ("Tehrani"); HSBC Bank USA, National Association; and HSBC Securities (USA) Inc. (collectively, "the Defendants"). The Plaintiff seeks compensatory and punitive damages under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO"), as well as for common law fraud under New York law; fraudulent inducement under New York law; conversion under New York law; aiding and abetting conversion under New York law; negligence under New York law; unauthorized signatures under the New York

2

Uniform Commercial Code Article III; breach of contract under New York law; and commercial bad faith under New York law.

Specifically, the Plaintiff alleges that the defendants Winston and Ganz, in furtherance of a fraudulent real estate scheme, defrauded the Plaintiff through an enterprise known as Winhaven, which included Winhaven Realty LLC; Winhaven Development Corp.; Winhaven Development of New York Inc.; Winhaven Group LLC; Winhaven Holdings LLC; Winhaven Management Corp.; Winhaven Management of New York Inc.; Winhaven of New York City LLC; Winhaven Associates LLC; Winhaven Associates II LLC; Winhaven Capital Partners; Winhaven 640 Broadway LLC; 640 Broadway Owners LLC; Winhaven Mattituck LLC; Winhaven Boerum LLC; and Winhaven Westhampton Beach Plaza LLC (collectively, "Winhaven").

The Plaintiff subsequently filed a First Amended Complaint on September 14, 2012. The First Amended Complaint asserted new claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty under New York law. The First Amended Complaint also withdrew the Plaintiff's previous claim for aiding and abetting conversion under New York law.

Presently before the Court are two motions. The first is a motion by Winston to disqualify counsel for the Plaintiff, Ira Lee Sorkin, Esq., on the grounds that (1) Sorkin previously represented Winston in proceedings before the National Association of Securities Dealers ("the NASD") and (2) Winston had consulted with Sorkin about Sorkin representing him when he was being investigated for matters connected with his criminal indictment for securities fraud, which occurred prior to his alleged defrauding of the Plaintiff. The second is a motion by Winston to dismiss or, in the alternative, to disqualify counsel for the Plaintiff, Ira Lee Sorkin, Esq., based on Sorkin's alleged used of privileged material related to Winston's abovementioned

criminal case.   For the reasons set forth below, the Court grants the first motion and grants in part and denies in part the second motion.

## I.  BACKGROUND

### A. The Underlying Action

The underlying action in this case arises from the following facts alleged in the Plaintiff's First Amended Complaint.

In or about January 1999, Winston began dating the Plaintiff's youngest daughter, Eve. More than a year later, in April 2000, Eve and Winston married.  At about this time, Winston learned that he and his securities brokerage firm, First United Equities Corporation ("First United"), were under federal investigation for securities fraud.  Following this investigation, in or about March 2001, Winston was indicted and faced criminal charges before the United States District Court for the Eastern District of New York (Garaufis, J.) for securities fraud and money laundering, among other crimes.  Winston subsequently pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit money laundering and was sentenced on May 25, 2005 to ten years of probation.  He was also ordered to make restitution in the amount of approximately $108,988,825.50 and was barred for life by the United States Securities and Exchange Commisssion from associating with a broker or dealer.

The Plaintiff claims that Winston convinced her, Eve and the rest of their family into believing that the criminal case against him was unjust and that he was a victim of his business partners' fraud.   He also allegedly convinced the Plaintiff that his probation sentence meant that he was released from his criminal charges.  According to the Plaintiff, she was not aware of the restitution order.

On August 13, 2003, the Plaintiff's husband, Martin Lorber, died after a year-long battle with lung cancer.  One month later, in or about September 2003, the Plaintiff went to Munich, Germany, for a one-month period in order to provide her mother, who lived in Munich, with full-time care during her recovery from emergency hip surgery.  The Plaintiff alleges that about this time Winston "saw the opportunity for which he had been waiting to reap the benefits of his marriage to Eve and his years spent charming her family."  (First Amend. Compl., ¶ 55.)  He thus offered to help the Plaintiff by (1) managing the Plaintiff's finances, including but not limited to her checking account, securities and brokerage accounts and her credit line with the defendant HSBC Bank; (2) maintaining oversight of certain household needs, including collecting the Plaintiff's mail; and (3) winding down and dissolving WorldWide Footwear, Inc. ("Worldwide"), which was Martin Lorber's business.

According to the Plaintiff, once Winston assumed management of her finances, he abused his position to fraudulently borrow or outright steal funds from her in the aggregate amount of approximately $10,000,000.  In this regard, Winston allegedly "conspired" with Ganz, Tehrani and others "to engage in a fraudulent scheme conducted through Winston's enterprise, Winhaven, with the objective of purchasing, developing and selling millions of dollars['] worth of real estate assets while hiding the same from the federal government and defrauding numerous lenders, banks, investors and the Internal Revenue Service in the process."  (First Amend. Compl., ¶ 7.)

This fraudulent scheme involved (1) deceptively inducing the Plaintiff to loan money to Winston and to Winhaven from her credit lines with the defendant HSBC Bank; (2) fraudulently advancing money from the Plaintiff's credit lines to Winhaven by forging her signature without her knowledge or consent; (3) manipulating securities in the Plaintiff's brokerage accounts; (4)

knowingly providing false financial and tax advice to the Plaintiff in order to disguise and conceal the fraudulent use of her credit lines; (5) operating checking accounts in the Plaintiff's name without her knowledge; (6) completing false statements of net worth for the Plaintiff without her knowledge or consent in order to secure a sizeable mortgage on a yacht; (7) continuing to operate WorldWide  and using it as a shell to take tax deductions based on business losses associated with the interest on the funds that were fraudulently advanced from the Plaintiff's credit line; (8) deceptively inducing the Plaintiff to loan Winston $500,000 to post a bond for Winhaven's purchase of a building in Manhattan; and (9) using at least some of the Plaintiff's own money without her knowledge or consent to purchase the Plaintiff's home for Winston's personal use.  (First Amend. Compl., ¶ 8.)

On September 18, 2012, Winston moved to dismiss the Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that (a) the Plaintiff's action was barred by the statute of limitations, (b) the Plaintiff failed to state a claim upon which relief may be granted, and (c) the Plaintiff failed to comply with the requirements of Fed. R. Civ. P. 9(b). The defendants Eva Tehrani; Sheldon Ganz; Sheldon Ganz, CPA, P.C.; HSBC Bank USA, National Association; and HSBC Securities (USA) Inc. have also filed motions to dismiss the First Amended Complaint.

**B.  As to Attorney Sorkin's Previous Representation of the Defendant Winston**

The following facts, which underlie Winston's motion to disqualify attorney Sorkin based on Sorkin's previous representation of Winston, are derived from Winston's moving and reply papers and the Plaintiff's opposition.

6

In 1998, the NASD entered a $625,000 arbitration award against Winston in favor of Jules and Florine Wachter ("the Wachters").  The arbitration award stemmed from Winston's conduct and that of First United in selling Ashton Technologies stock to the Wachters.

As a result of this award, in or about 1999, the NASD began a regulatory investigation into Winston's conduct and that of First United.  In 1999, Winston retained Sorkin in connection with this inquiry, and, during the course of this representation, Sorkin allegedly engaged in extensive discussions with Winston concerning the latter's business practices at First United. These discussions also touched upon the conduct that was the subject of Winston's 2001 criminal indictment for securities fraud and money laundering, among other crimes.

Sorkin appeared with Winston on two separate occasions for questioning by the NASD, first on September 22, 1999, and again on October 12, 1999.  The scope of the NASD's questioning went beyond the Wachters' case and involved allegations that later appeared in Winston's 2001 criminal indictment.  Sorkin advised Winston to invoke his Fifth Amendment privilege against self-incrimination in response to a great number of the NASD's questions.

Subsequently, Winston learned he was the subject of a criminal investigation.  Winston consulted with Sorkin concerning whether he would represent him and discussed with Sorkin his understanding of the potential charges against him and the related facts.  Sorkin did not immediately reject the representation, but later called Winston to advise him that he had a conflict of interest and, thus, could not represent him.

On March 8, 2001, Winston was indicted.  The indictment included allegations about Winston's conduct concerning the Wachters and Ashton Technologies, as well as the sales of other stocks, and misrepresentations related to these matters.  Winston allegedly discussed these allegations with Sorkin in connection with the NASD proceedings.  He also claims that he

discussed these allegations when he consulted with Sorkin about the criminal investigation against him.

Although Sorkin does not remember representing Winston at the NASD, he does not dispute that he represented Winston during the abovementioned NASD proceedings.   Further, Sorkin never represented Winston in his criminal case in any capacity or at any time after the 1999 NASD proceedings.

## C.  As to the Allegations Concerning Attorney Sorkin's Use of Privileged Material

The following facts which underlie Winston's motion to dismiss or, in the alternative, to disqualify attorney Sorkin based on his alleged use of a privileged document, are derived from Winston's moving and reply papers and the Plaintiff's opposition.

From 2006 through 2012, Winston was represented by the law firm of Gerald B. Lefcourt, P.C. ("Lefcourt") on a number of matters, including securing the termination of his probation arising from his prior criminal conviction.  Faith A. Friedman, Esq., an attorney with Lefcourt, worked on this matter.  As part of their efforts, Lefcourt prepared a "Memorandum of Law in Support of Defendant's Motion for Termination of Probation Pursuant to 18 U.S.C. § 3564(c) and Fed. R. Crim. P. Rule 32.1 and Discharge from Supervision" ("the Probation Memo").  According to attorney Friedman, her firm had contemplated filing the Probation Memo with the sentencing court, but in fact, never filed it with the court.

The Probation Memo is attached as an exhibit to both the papers of Winston and the Plaintiff.  Both parties filed it under seal.  Although the Probation Memo appears to be formatted like a memorandum of law that would be filed with a court, there are two blanks on page 3 and one blank page 5, which have not been filled in.  The Probation Memo also contains a signature line but is unsigned.  In addition, the Probation Memo is dated May 26, 2010.  However, a

review of the docket in Winston's criminal case, E.D.N.Y. Case No. 00-CR-01248, indicates that the Probation Memo was never filed with the court either on that date or on any other date.  In fact, the only document filed on May 26, 2010 was a sealed order by the court (Garaufis, J.), which appears to have been endorsed on a May 17, 2010 letter of Friedman.  That letter requested that the court order the court reporter to release to Lefcourt a copy of the transcript from Winston's May 25, 2005 sentencing.

      In the Probation Memo,


- REDACTED -



      According to Winston, to the best of his recollection, he never authorized Lefcourt to provide any third party with a copy of the Probation Memo.  Winston also claims, to the best of his recollection, that he did not share the Probation Memo with anyone except his wife, Eve, at a time prior to their pending divorce and when he believed that their marriage was still a successful one.  Moreover, Winston asserts that he gave the Probation Memo to Eve as a strictly confidential communication and never authorized her to share it with anyone.  However, Eve has no recollection of ever seeing the Probation Memo or of having a conversation with Winston concerning its contents until after the Complaint in this case was filed.

      On July 18, 2012, the Plaintiff filed her Original Complaint in this action.  This Complaint included a single reference to the Probation Memo.  Specifically, paragraph 15 of the Original Complaint stated:

                Defendant Jonathan Winston is a citizen of the State of
                New York.  He maintains a residence at 59 Cornwells Beach Road,

> Sands Point, New York 11050 and an apartment located in the
> Plaza Hotel at 768 5th Avenue, Apartment 513, New York, New
> York 10019.  Winston is a recidivist; indeed, he pleaded guilty
> before this Court to one count of conspiracy to commit securities
> fraud and one count of conspiracy to commit money laundering for
> his role as a principal in the boiler-room broker-dealer fraud
> involving First United (Case No. 1:00-cr-01248 (NGG)).  Winston
> was sentenced on May 25, 2005 to a total of 10 consecutive years
> of probation and ordered to make restitution in the amount of
> $108,988,825.50.  Upon information and belief, Winston has
> satisfied none of his multi-million-dollar restitution order.  Upon
> further information and belief, Winston's probation was lifted by
> this Court following the submission of a memorandum of law in
> support of his motion to lift his probation (the "Probation Memo").
> The Probation Memo, in fact, contains false and misleading
> information, including much of the same false and misleading
> information alleged herein.

(Original Compl., ¶ 15.)

Attorney Sorkin has provided the Court with varying accounts of how he obtained the

Probation Memo referenced in his Original Complaint.  At the October 5, 2012 conference held

in this matter, Sorkin stated:

> The [Probation Memo] was given to a third party.  That third party
> passed it on to another party and that party gave the document to
> me in the presence of the first third party.  And there were
> conversations had at the time with the third party present, the first
> recipient of the memo.  Additionally, your Honor, the memo was
> known to my client as well.

However, in his opposition papers to Winston's present motion, Sorkin now claims that

he received the document as an email.  In this regard, Sorkin's affidavit states that he was

introduced to the Plaintiff by Raoul L. Felder, Esq., who had previously represented Eve in a

divorce action against Winston.  In or about October 2011, the Plaintiff met with Sorkin and his

associate, Savannah Stevenson, Esq., in order to seek advice concerning the present action.

Following this meeting, the Plaintiff decided to retain Sorkin's firm.  Thereafter, on or about

10

November 1, 2011, Sorkin allegedly received a copy of the Probation Memo via email from the offices of attorney Felder.

According to Sorkin's affidavit, after receiving the Probation Memo, Sorkin discussed its contents with Felder and Felder's associate, Daniel Nottes, Esq., neither of whom advised Sorkin that the Probation Memo was a privileged document.  Sorkin claims that at some point, Felder informed him that the Probation Memo had been given to him by either the Plaintiff or Eve.  However, in his affidavit, Felder states that he does not have any recollection concerning the actual receipt of the Probation Memo.  Furthermore, as stated above, Eve asserts that she has no recollection of ever seeing the Probation Memo.  In addition, Sorkin's affidavit alleges that the Plaintiff has no recollection of seeing the Probation Memo, although the Plaintiff has not included her own affidavit in her opposition papers.

On the evening of September 13, 2012, Sorkin reviewed the docket in Winston's criminal case and noted that on May 26, 2010, there had been a filing under seal.  In order to determine whether the Probation Memo was actually filed with the court (Garaufis, J.), Sorkin and one of his associates contacted Friedman by phone to inquire about the Probation Memo.  He informed her that he was in possession of an unsigned document and that he could not find evidence on the court's docket that it had been filed with the court.  Friedman told Sorkin that she did not believe Lefcourt ever filed the Probation Memo with the court and that she believed that it was privileged, but that she would verify that fact.  Sorkin also informed Friedman that he had obtained the Probation Memo from matrimonial counsel, which Friedman understood to mean counsel for Eve.

According to Friedman, on the morning of September 14, 2012, she spoke to Sorkin's associate and advised him again that the Probation Memo had not been filed with the court and

11

that she believed it was privileged.  The associate informed her that the Probation Memo and all copies would be destroyed.  However, Sorkin claims that it was Friedman who told him that the Probation Memo should be destroyed.  In any event, Sorkin concedes that his firm did tell Friedman that the Probation Memo would be destroyed, but that he then decided against doing so because he believed that even if it was a privileged communication, the privilege had been waived when Winston gave the Probation Memo to his wife, Eve.  He also concluded that the Probation Memo contained no legal advice, but rather, was filled with what he believed to be factual misrepresentations, which meant the crime-fraud exception to the privilege was applicable.

On September 14, 2012, the Plaintiff filed her First Amended Complaint.  It contained no reference to the Probation Memo.  On that same date, Winston's counsel, Judd Burstein, Esq., was contacted by Friedman, who informed him that Sorkin had contacted her with regard to the Probation Memo.  Burstein then filed a letter, also on September 14, 2012, in order to notify the Court that he believed that Sorkin used privileged material.  He requested a conference with respect to this issue.  Thereafter, Burstein and Sorkin exchanged a series of emails concerning whether the Probation Memo was a privileged document and how Sorkin came to obtain it.  On October 3, 2012, the Court granted Winston's request for a conference scheduled for October 5, 2012.

The conference was held on October 5, 2012.  At the conclusion of the conference, the Court directed Winston to file a formal motion with respect to the Probation Memo and set a briefing schedule.

**II. THE MOTION TO DISQUALIFY BASED ON ATTORNEY SORKIN'S PRIOR
REPRESENATION OF THE DEFENDANT WINSTON**

**A.  Legal Standard**

"The authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'" Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (citing Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).  In exercising this power, the Court must "be solicitous of a client's right freely to choose his counsel – a right which of course must be balanced against the need to maintain the highest standards of the profession."  Government of India v. Cook Industries, Inc., 569 F.2d 737, 739 (2d Cir. 1978); see also Hempstead Video, Inc., 409 F.3d at 132.   "In the Eastern District, ethical standards are governed by the New York State Rules of Professional Conduct."   Fairfield Fin. Mortg. Group, Inc. v. Luca, 11-CV-3802 (ADS) (ETB), 2012 U.S. Dist. LEXIS 104654, at *6 (E.D.N.Y. July 25, 2012) (citing Local Civil Rule 1.3).

Whether or not disqualification is warranted is subject to the Court's discretion. Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990).  However, given the "immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons . . . [and] inevitably cause delay," Nyquist, 590 F.2d at 1246, "motions to disqualify are subject to a high burden of proof," Hickman v. Burlingont Bio-Medical Corp., 371 F. Supp. 2d 225, 229 (E.D.N.Y. 2005).  See also Government of India, 569 F.2d at 739.  Accordingly, "[u]nder the restrained approach adopted by the Second Circuit, relief will be granted only when the facts concerning the lawyer's conduct poses a significant risk of trial taint," particularly when the "'attorney is at least potentially in a position to use privileged information concerning the other side through prior representation . . . , thus giving his present client an unfair advantage.'"   Mitchell v. Metro. Life Ins. Co., 01 Civ.

13

2112 (WHP), 2002 U.S. Dist. LEXIS 4675, at *10-11 (S.D.N.Y. Mar. 20, 2002) (quoting

Armstrong v. McAplin, 625 F.2d 433, 444 (2d Cir. 1980), vacated on other grounds and

remanded, 449 U.S. 1106, 101 S. Ct. 911, 66 L. Ed. 2d 835 (1981)); see also Glueck v. Jonathan

Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981).

 This Court has recognized three grounds on which an attorney could be disqualified "(1)

where an attorney's conflict of interests undermines the court's confidence in the vigor of the

attorney's representation of his client[;] (2) where the attorney is at least potentially in a position

to use privileged information concerning the other side through prior representation thus giving

his present client an unfair advantage[;] . . . [or (3)] where an attorney is in a position to use

confidential information obtained from a potential client," which is based on the New York Code

of Professional Responsibility Rule 1.18.  Miness v. Ahuja, 762 F. Supp. 2d 465, 478-479

(E.D.N.Y. 2010) (citations and internal quotation marks omitted).

 In cases concerning prior representation, an attorney may be disqualified if the following

three factors are met:

> (1) the moving party is a former client of the adverse
> party's counsel;
> (2) there is a substantial relationship between the subject
> matter of the counsel's prior representation of the moving party and
> the issues in the present lawsuit; and
> (3) the attorney whose disqualification is sought had access
> to, or was likely to have had access to, relevant privileged
> information in the course of his prior representation of the client.

Hempstead Video, Inc., 409 F.3d at 133 (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d

Cir. 1983)).  In this context, "substantial relationship" is understood to mean that "the

relationship between issues in the prior and present cases is patently clear or that the issues

involved are identical or essentially the same."  Mitchell, 2002 U.S. Dist. LEXIS at *12 (citing

Government of India, 569 F. 2d at 739-40).  In further explanation, "if the facts giving rise to an

14

issue which is material in both the former and the present litigations are as a practical matter the same, then there is a 'substantial relationship' between the representations for purposes of a disqualification motion."  United States Football League V.. National Football League, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985).

With respect to prospective clients, Rule 1.18 of the New York Code of Professional Responsibility ("NYCPR") provides in pertinent part:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a "prospective client."
> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation . . . .
> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d) [which no party here asserts applies]. . . .

Thus, Rule 1.18 also requires there be a showing that (1) there is a substantial relationship between the pending matter and the previous matter and (2) that the attorney whose disqualification is sought has relevant privileged information.

As indicated above, "the issue is whether there is a real risk that the trial will be tainted." Hickman, 371 F. Supp. 2d at 229 (citations and internal quotation marks omitted).  Thus, "[t]he appearance of impropriety, standing alone, is insufficient to grant a motion to disqualify."  Id. Furthermore, "[s]peculation regarding the divulging of client confidences will not suffice to grant a motion to disqualify" either.  Id.   In addition, "[t]he risk that an attorney may cross-examine a former client is not sufficient to disqualify an attorney" absent a serious risk of taint or tangible prejudice.  Med. Diagnostic Imaging, PLLC v. CareCore Nat'l, LLC, 542 F. Supp. 2d 296, 315 (S.D.N.Y. 2008).

15

**B.  Application to the Defendant Winston's Motion to Disqualify**

On August 10, 2012, Winston filed a motion to disqualify Sorkin from representing the Plaintiff in the instant case.  In the motion, he argued that: (1) Sorkin had previously represented him in proceedings before the NASD, which involved extensive discussions with Sorkin concerning conduct that later appeared in his 2001 criminal indictment; and (2) Sorkin had considered representing him during his criminal investigation into, among other crimes, securities fraud and money laundering, before declining due to a conflict of interest, and therefore, he had been a prospective client of Sorkin in the latter matter.

### 1.  As to Sorkin's Prior Representation of Winston

Neither Winston nor Sorkin dispute that Sorkin represented Winston before the NASD in 1999.  However, they do dispute (1) whether Sorkin's previous representation of Winston is substantially related to the present case before this Court and (2) whether Sorkin had access to relevant privileged material during the course of his prior representation of Winston.

Winston argues that the present case is substantially related to Sorkin's previous representation of him at the NASD proceedings because the NASD proceedings raised issues connected to his past criminal conduct and the Plaintiff's Complaint contains allegations concerning his indictment, his status as a convicted felon and his misrepresentations to the Plaintiff about his criminal conduct.  He further contends that Sorkin "will be placed in an impossible position if he is not disqualified," since it would be improper for him to seek to use evidence of Winston's criminal conduct against him.  Lastly, Winston argues that Sorkin would not have advised Winston to invoke his Fifth Amendment Privilege during the NASD proceedings unless he had received privileged and prejudicial information.

16

The Court finds that the defendant Winston has established that there is a real risk of trial taint if the Plaintiff is permitted to proceed forward with Sorkin as her attorney.  See Hickman, 371 F. Supp. 2d at 229.   The facts at issue in the NASD proceedings – and subsequently, in Winston's criminal case – involved acts of securities fraud and money laundering, which Winston committed in connection with a market manipulation scheme involving First United. Although this past criminal conduct, the NASD proceedings and the criminal conviction all occurred before Winston allegedly began defrauding the Plaintiff in 2003, the facts at issue in these past matters will undoubtedly be material to the pending litigation, as Winston's intent and credibility will be key issues.

In addition, the First Amended Complaint alleges that Winston convinced the Plaintiff that the criminal case against him was unjust and that he was a victim of his business partners' fraud.  Certainly, Sorkin obtained useful information from his prior representation of Winston that he can now use to the Plaintiff's advantage with respect to whether Winston knowingly misrepresented the factual allegations underlying his criminal case.  See DeVittorio v. Hall, 07 Civ. 0812 (WCC) ECF CASE, 07 Civ. 1956 (WCC) ECF CASE, 2007 U.S. Dist. LEXIS 91496, at *24 (S.D.N.Y. Dec. 12, 2007) ("Although the issues here are not identical, they need not be in order to justify disqualification.  If it is possible that [plaintiffs' attorney] obtained substantially relevant information in his previous representations that could be used to plaintiffs' advantage and defendants' disadvantage in the current litigation, then he and his firm should be disqualified from representing plaintiffs.") (citation omitted).

Furthermore, the fact that Sorkin may have to cross-examine Winston about his past criminal conduct is a sufficient ground for disqualification in this particular case.   Although courts have previously held that the risk of an attorney cross-examining his former client is

17

generally not a sufficient basis to disqualify an attorney, those courts have also recognized that the decision of whether to disqualify an attorney "must ultimately be guided by the goal of a trial process that lacks any hint of a taint Skidmore v. Warburg Dillon Read LLC, 99 Civ. 10525 (NRB), 2001 U.S. Dist. LEXIS 6101, at *14 (S.D.N.Y. May 10, 2001). See also Med. Diagnostic Imaging, PLLC, 542 F. Supp. 2d at 315 ("[T]he question of taint is the ultimate question the Court must answer.").

Here, the possibility for trial taint is clear. Sorkin previously represented Winston at two NASD proceedings involving allegations of fraud that were ultimately a basis for his criminal conviction. Through the course of his representation of Winston, Sorkin would have obtained privileged information concerning these allegations. Yet, Sorkin will undoubtedly question Winston about these very same allegations during cross-examination in this case. Moreover, Winston's past fraudulent conduct – and any privileged information that Sorkin would have gained with respect to this conduct – is particular relevant in this lawsuit, since (1) the Plaintiff alleges that Winston misled her about his criminal case and (2) the Plaintiff alleges that she was defrauded by Winston. Therefore, Winston will be at a significant disadvantage during cross-examination, while the Plaintiff will gain an unfair significant advantage.

These prior criminal conduct issues are ideal subjects for cross-examination, and they are within the knowledge of attorney Sorkin. His obligation to the Plaintiff is to use this information against Winston, his former client. If he declines to use this information, he will be violating his duty to Lorber, his present client. Unfortunately, this serious conflicting dilemma can only be avoided by removing Sorkin as counsel for the Plaintiff in this case.

Accordingly, as Winston has demonstrated that there is a substantial relationship between the subject matter of Sorkin's prior representation of him and the issues in the present matter and

18

that Sorkin is likely to have had access to relevant privileged information, disqualification of

Sorkin is warranted.  Accordingly, Winston's motion to disqualify Ira Lee Sorkin, Esq., as

counsel for the Plaintiff is granted.  See Hempstead Video, Inc., 409 F.3d at 133.

**2.  As to the Defendant Winston's Prior Communications with Attorney Sorkin as a Prospective Client**

Winston also argues that his prior communication with Sorkin about the possibility of

Sorkin representing him during his criminal investigation is an additional ground for

disqualifying Sorkin as the Plaintiff's counsel.  Winston points to paragraph 40 of the Plaintiff's

Complaint, which alleges that "sometime during the year 2000 Winston learned that his

brokerage firm, First United, and many First United principals and employees were under

investigation . . . for securities fraud, money laundering and other related criminal activity."  (Pl.

Orig. Compl., ¶ 40.)  According to Winston, because of his prior consultation with Sorkin, he

would be prejudiced with respect to this allegation.

The Court finds that this prior communication is sufficiently related to the present case to

justify disqualification because "the information [Winston] disclosed in that earlier consultation

[will be] useful in [this] case."  Bennett Silvershein Assoc. v. Furman, 776 F. Supp. 800, 804

(S.D.N.Y. 1991).   Although the two matters are not identical, there is a strong possibility that

Sorkin will be able to "gain some advantage not otherwise available but for the prior confidential

relationship, even if that advantage goes only to background matters."   Id. at 804.   Indeed, the

Plaintiff's First Amended Complaint contains references to Winston's past criminal conduct in

order to not only provide context, but also to suggest that Winston misrepresented the

seriousness of his criminal case to the Plaintiff.   As a result, NYCPR Rule 1.18 provides another

basis for disqualifying attorney Sorkin in this case.

**III.  THE MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO DISQUALIFY BASED ON ATTORNEY SORKIN'S ALLEGED USE OF A PRIVILEGED DOCUMENT**

<u>**A.  Legal Standard**</u>

"It is [] well established that the party invoking a privilege bears the burden of establishing its applicability to the case at hand."  <u>Mercator Corp. v. United States</u>, 318 F.3d 379, 384 (2d Cir. 2002).  In this case, Winston invokes three kinds of privilege with respect to the Probation Memo:  (1) the attorney-client privilege; (2) the work product privilege; and (3) the marital communications privilege.

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."  <u>Brennan Ctr. for Justice at New York. Univ. Sch. of Law v. U.S. Dep't of Justice</u>, Docket No. 11-4599, 2012 U.S. App. LEXIS 19685, at *59 (2d Cir. Sept. 19, 2012) (internal citation omitted); <u>see also</u> <u>Sackman v. Liggett Group</u>, 167 F.R.D. 6, 18 (E.D.N.Y. 1996) ("The attorney-client privilege applies to confidential communications between an attorney and his or her client during the course of employment.").  However, the privilege is limited to only those confidential communications "that are made for the purpose of obtaining or providing legal advice."  <u>Kai USA Ltd. v. Camillus Cutlery Co. (In re Kroll)</u>, 224 F.R.D. 326, 328 (E.D.N.Y. 2004).

Conversely, "[t]he work product protection is distinct from and broader than the attorney-client privilege," <u>Favors v. Cuomo</u>, 11-CV-5632 (DLI)(RR)(GEL), 2012 U.S. Dist. LEXIS 113076, at *26 (E.D.N.Y. Aug. 10, 2012) (citations and internal quotation marks omitted), and "applies to documents prepared primarily in anticipation of litigation."  <u>Sackman</u>, 167 F.R.D. at 19; <u>see</u> Fed. R. Civ. P. 23(b)(3)(A).  It "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation,

20

free from unnecessary intrusion by his adversaries." United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (citation and internal quotation marks omitted).

Lastly, "the marital communications privilege[] protects private and confidential communications between spouses from disclosure." In re Reserve Fund Secs. & Derivative Litig. v. Reserve Mgmt. Co., 275 F.R.D. 154, 157 (S.D.N.Y. 2011) (citations and internal quotation marks omitted). Specifically, it "provides that communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged." Id. (citation and internal quotation marks and altercations omitted). In order for a party to assert the marital communications privilege, he must show that there was "a valid marriage at the time of the communication" and that the communication was "made in confidence, which is presumed." Id. at 158. Moreover, "the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other." Id.

"Voluntary disclosure of confidential, privileged material to a third party generally waives an applicable privilege." Sec v. NIR Group, LLC, 283 F.R.D. 127 (E.D.N.Y 2012). However, "such disclosure does not waive the work product privilege unless the disclosure substantially increases the opportunity for potential adversaries to obtain the information." Id.; see also United States v. Ghavami, 10 Cr. 1217 (KMW) (JCF), 2012 U.S. Dist. LEXIS 80593, at *20 (S.D.N.Y. June 5, 2012) (holding that "[w]ork product protection is waived only if disclosure to a third party substantially increases the risk that it will be obtained by an adversary"). Of importance, the risk that the disclosure may potentially result in the information being obtained by potential adversaries "must be evaluated from the viewpoint of the party seeking to take advantage of the doctrine." Ghavami, 2012 U.S. Dist. LEXIS at *20.

Further, "communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1038 (2d Cir. 1984). "Under this exception the proponent must establish: (1) probable cause to believe that a crime or fraud has been attempted or committed; and (2) probable cause to believe that the communications were in furtherance thereof." Sackman, 167 F.R.D. at 19. See also Madanes v. Madanes, 199 F.R.D. 135, 147-48 (S.D.N.Y. 2001) ("The burden is on the party invoking the crime-fraud exception to 'demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime.'") (quoting United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997)). Likewise, there is a "partnership in crime exception" or "joint participation exception" to the marital communication privilege, which provides that a spouse may testify as to confidential communications when such "testimony is not given under compulsion and the communications in question were made in furtherance of unlawful joint criminal activity." United States v. Estes, 793 F.2d 465, 467-68 (2d Cir. 1986).

## B.  Application to the Defendant Winston's Motion to Dismiss or, in the Alternative, to Disqualify

On October 17, 2012, Winston filed the motion to dismiss or, in the alternative, to disqualify Sorkin from representing the Plaintiff.  In the motion, he argued that Sorkin had unethically relied upon a privileged document in bringing the instant action.

As an initial matter, the Court addresses the November 8, 2012 letters from the Plaintiff and Winston concerning Winston's November 16, 2012 reply papers.  Specifically, the Plaintiff argues that (1) Winston's reply papers improperly raise, for the first time, the new argument that

the Plaintiff stole the Probation Memo from Winston's home and (2) Winston's reply papers fail to comply with the Court's Individual Rule IV(B)(i), because Winston's Reply Memorandum of Law was impermissibly supplemented by the reply declaration of Burstein.

Courts generally will not consider arguments raised for the first time in reply. See Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162, 164-165 (E.D.N.Y. 2005); Matera v. Native Eyewear, Inc., 355 F. Supp. 2d 680, 682-683 (E.D.N.Y. 2005); Domino Media, Inc. v. Kranis, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998).  Therefore, to the extent Winston's reply papers attempt to allege, for the first time, that the Plaintiff stole the Probation Memo from Winston's home, the Court will not consider this argument.  However, even if the Court did consider this argument, the Court would find it without merit, because it is unsupported by any evidence beyond Winston and Burstein's conclusory and self-serving assertions.  Moreover, the argument seems to be in contradiction to Winston's original motion papers, which suggest that Winston gave the Probation Memo to Eve.

With respect to Burstein's Reply Declaration, "this Court has discretion to consider documents filed in violation of procedural rules."  Pagan v. Abbott Labs., Inc., 10-CV-4676(ADS)(WDW), 2012 U.S. Dist. LEXIS 159273, at *9 (E.D.N.Y. Oct. 20, 2012) (citation omitted); Church & Dwight Co. v. Kaloti Enters. of Mich., L.L.C., 07 Civ. 0612 (BMC), 2011 U.S. Dist. LEXIS 110955, at *6 n. 1 (E.D.N.Y. Sept. 27, 2011) (citation and internal quotation marks omitted).  Accordingly, exercising its discretion, the Court will consider Burstein's Reply Declaration, as well as Sorkins's Affidavit in Opposition, which both supplement their respective Memorandum of Law.

It is clear to the Court that Winston has met his burden of establishing that the Probation Memo at issue is a privileged document.  The Probation Memo is a draft document, which is

23

evident by the fact that it is unsigned, contains blanks that have not been filled, and it was never

filed with any court. Moreover, the document was prepared by Winston's attorneys with the

view of filing it with the court in his criminal case and contains

- REDACTED -

Accordingly, the Court finds that the Probation Memo is protected by the work product privilege.

See Sackman, 167 F.R.D. at 19.

The Court also finds that the work product privilege has not been waived in this case.

Although Winston may have given the Probation Memo to his wife, Eve, this alone is not enough

to waive the work product privilege. As explained above, waiver of the work product privilege

requires more than just a voluntary disclosure of a privileged document to a third party; rather,

the voluntary disclosure must result in a substantial increase in the risk that it will be obtained by

an adversary. Ghavami, 2012 U.S. Dist. LEXIS at *20. In this case, Winston gave the

Probation Memo to Eve at a time when their marriage was apparently strong. The Probation

Memo itself even contains

- REDACTED -

Thus, at that time, Winston would have had no reason to believe that the disclosure of the

Probation Memo to his wife would result in the document being obtained by a potential

adversary. Id.

In addition, Winston's disclosure of the Probation Memo to Eve is protected by the

marital communications privilege, since at the time of the disclosure, their marriage was still

viable. Accordingly, the disclosure of the Probation Memo is a privileged communication and

no waiver is applicable. See, e.g., Murray v. Board of Education, 199 F.R.D. 154, 155 (S.D.N.Y.

2001); Solomon v. Scientific American, Inc., 125 F.R.D. 34, 28 (S.D.N.Y. 1988).

While the Plaintiff argues that "as of May 26, 2010, the date of the Probation Memo, Winston was fully aware of his ongoing fraud against Annette Lorber, and, thus, should have reasonably anticipated future litigation relating to his elaborate fraud," this argument is without merit.  (Pl. Opp., pg. 9.)  The Court finds that the Plaintiff has failed to produce any evidence to support this argument beyond the allegations set forth in her First Amended Complaint. However, "[t]he complaint is not sworn to, and is not evidence."   In re Omnicom Group, Inc. Sec. Litig., 02 Civ. 4483 (WHP)(MHD), 2007 U.S. Dist. LEXIS 60298, at *64 (S.D.N.Y. Aug. 10, 2007).

Likewise, the Plaintiff's arguments concerning the crime-fraud exception and joint fraud exception are also without merit.  Again the Plaintiff relies solely on the allegations in her First Amended Complaint to argue that any fraud occurred.  Indeed, "the allegations in the Complaint cannot suffice to establish probable cause to believe that a fraud was perpetrated.  Otherwise, through the mere allegation of fraud in a complaint, a party could use the crime-fraud exception to wholly swallow the [work product] privilege." Conopco, Inc. v. Wein, 05 Civ. 09899, 2007 U.S. Dist. LEXIS 46945, at *23 (S.D.N.Y. June 27, 2007)

The Probation Memo is clearly protected under the work product privilege and that privilege has not been waived.  Therefore, the Court need not reach the question of whether the document was also protected by the attorney-client privilege or the marital communications privilege.  However, the Court notes that the attorney-client privilege would not apply here, because Winston has failed to demonstrate that the communications memorialized in the Probation Memo were intended to be kept confidential.  Indeed, if the Probation Memo was drafted for the purpose of potentially filing it with the court, it seems that there was no intent for

the communications shared between Winston and his attorney to remain confidential.  See Brennan Ctr., 2012 U.S. App. LEXIS  at *59.

Although the Court finds that Sorkin improperly used a privileged document in bringing forth this litigation on behalf of the Plaintiff, the Court declines to dismiss the Plaintiff's First Amended Complaint.  Rather, the Court determines that Sorkin's use of the Probation Memo is an additional ground in support of his disqualification as the Plaintiff's attorney.

It is clear to the Court that Sorkin should not have used the Probation Memo in the manner he did.   Furthermore, Winston has demonstrated that he has been prejudiced by the Plaintiff's use of the Probation Memo in drafting the Original Complaint, thus raising significant allegations of trial taint.  See United States v. Stewart, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (requiring allegations of taint when disqualifying an attorney for having reviewed material protected by the work product privilege).  First, Sorkin himself admits that "the Probation Memo contains misrepresentations and lies that are coextensive with the allegations in the First Complaint and are pleaded again in the First Amended Complaint."  (Pl. Opp., Sorkin Aff., ¶ 28.)  Furthermore, as Winston explains, the Probation Memo (1) "was the epicenter of Sorkin's alleged 'months long investigation in Defendant Winston's conduct'"; (2) "plainly provided Sorkin with his first description of the business structure through which Mr. and Mrs. Winston conducted their real estate ventures"; and (3) was used "to develop purported 'facts' that he claims demonstrate that structure to be fraudulent."  (Def. Reply, pg. 7.)

## IV.  CONCLUSION

The Court denies Winston's motion to dismiss, but grants his motion to disqualify attorney Ira Lee Sorkin, Esq.   The Plaintiff is directed to retain new counsel within 45 days of the date of this Order.  This litigation is stayed until the Plaintiff retains new counsel.  The Court

26

also prohibits the Plaintiff from using the Probation Memo at the trial or at any other stage of this litigation.  Upon receipt of this Order, the Plaintiff, Sorkin and Sorkin's firm are directed to immediately return all copies to Winston without retaining any copies.  Within five days of the date of this Order, the Plaintiff's Counsel is directed to file an affidavit confirming his, his firm's and his client's compliance with this Order.

For the foregoing reasons, it is hereby:

**ORDERED**, that Winston's motion to disqualify the Plaintiff's counsel, Ira Lee Sorkin, Esq., based on his prior representation of Winston is granted, and it is further

**ORDERED**, that Winston's motion to dismiss based on Sorkin's use of privileged materials is denied, and it is further

**ORDERED**, that Winston's motion to disqualify the Plaintiff's counsel, Ira Lee Sorkin, Esq., for using privileged materials is granted, and it is further

**ORDERED**, that the Plaintiff is directed to retain new counsel with 45 days of the date of this Order, and it is further

**ORDERED**, that this litigation is stayed until the Plaintiff retains new counsel, and it is further

**ORDERED**, that the Plaintiff is prohibited from using the Probation Memo at trial or at any other stage of this litigation.  The Court directs the Plaintiff, Sorkin and Sorkin's firm, upon receipt of this Order, to immediately return all copies to Winston without retaining any copies. Within five days of the date of this Order, the Plaintiff's Counsel is directed to file an affidavit confirming his, his firm's and his client's compliance with this Order.

**SO ORDERED.**
Dated: Central Islip, New York
November 24, 2012

                                         */s/ Arthur D. Spatt*
                                          ARTHUR D. SPATT
                              United States District Judge