**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
ANNETTE LORBER,

                Plaintiff,

        -against-

JONATHAN WINSTON, SHELDON M.
GANZ, SHELDON M. GANZ, CPA, P.C.,
EVA TEHRANI, HSBC BANK USA,
NATIONAL ASSOCIATION, HSBC
SECURITIES (USA) INC.,

                Defendants.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-3571 (ADS) (ETB)

<u>**APPEARANCES:**</u>

**Otterbourg, Steindler, Houston and Rosen, P.C.**
*Attorneys for the Plaintiff*
230 Park Avenue
New York, NY 10169
   By:  Richard Gerard Haddad, Esq., Of Counsel

**Judd Burstein PC**
*Attorney for the Defendant Jonathan Winston*
1790 Broadway
Suite 1501
New York, NY 10019
   By:  Judd Burstein, Esq., Of Counsel

**Matalon Shweky Elman PLLC**
*Attorneys for the Defendants Sheldon M. Ganz & Sheldon M. Ganz, CPA, PC*
450 7th Avenue
33rd Floor
New York, NY 10123
   By:  Howard I. Elman, Esq., Of Counsel

**Law Offices of Eric Franz PLLC**
*Attorney for the Defendant Eva Tehrani*
747 Third Avenue
20th Floor
New York, NY 10017
    By:  Eric P. Franz, Esq.
          Andrew Leopoldo Mancilla, Esq., Of Counsel

**Law Offices of Steven D. Isser**
*Attorney for the Defendant Eva Tehrani*
1359 Broadway
Suite 2001
New York, NY 10018
    By:  Steven David Isser, Esq., Of Counsel

**Sills Cummis & Gross P.C.**
*Attorneys for the Defendants HSBC Bank USA, National Association*
*& HSBC Securities (USA) Inc.*
30 Rockefeller Plaza
New York, NY 100112
    By:  Jonathan Young, Esq.
          Andrew W. Schwartz, Esq., Of Counsel

<u>**NO APPEARANCE**</u>

513 Central Park LLC (Relief Defendant)

**SPATT, District Judge**.

On July 18, 2012, the Plaintiff Annette Lorber ("the Plaintiff") commenced this action by filing a Complaint against multiple defendants, which was thereafter reduced to the following: Jonathan Winston ("Winston"); Sheldon M. Ganz ("Ganz"); Sheldon M. Ganz, CPA, P.C.; Eva Tehrani ("Tehrani"); HSBC Bank USA, National Association ("HSBC Bank"); and HSBC Securities (USA) Inc. ("HSBC Securities," and collectively, "the Defendants"). The Plaintiff seeks compensatory and punitive damages under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. ("RICO"), as well as for common law fraud under New York law; fraudulent inducement under New York law; conversion under New York law; aiding and abetting conversion under New York law; negligence under New York law;

unauthorized signatures under the New York Uniform Commercial Code Article III; breach of contract under New York law; and commercial bad faith under New York law.

Specifically, the Plaintiff alleges that the Defendants Winston and Ganz, in furtherance of a fraudulent real estate scheme, defrauded the Plaintiff through an enterprise known as Winhaven, which included Winhaven Realty LLC; Winhaven Development Corp.; Winhaven Development of New York Inc.; Winhaven Group LLC; Winhaven Holdings LLC; Winhaven Management Corp.; Winhaven Management of New York Inc.; Winhaven of New York City LLC; Winhaven Associates LLC; Winhaven Associates II LLC; Winhaven Capital Partners; Winhaven 640 Broadway LLC; 640 Broadway Owners LLC; Winhaven Mattituck LLC; Winhaven Boerum LLC; and Winhaven Westhampton Beach Plaza LLC (collectively, "Winhaven").

The Plaintiff subsequently filed an Amended Complaint on September 14, 2012. The Amended Complaint asserted new claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty under New York law. The Amended Complaint also withdrew the Plaintiff's previous claim for aiding and abetting conversion under New York law. On November 29, 2012, with permission from the Court, the Plaintiff re-filed the Amended Complaint with corrected exhibits.

Presently before the Court are five motions. In this regard, each of the remaining Defendants moves to dismiss the Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 9(b), 12(b)(6) and the statute of limitations, among other grounds. For the reasons set forth below, the Court dismisses the Plaintiff's Amended Complaint.

# I. BACKGROUND

Unless otherwise stated, the following facts are drawn from the Plaintiff's Amended

Complaint and construed in a light most favorable to the Plaintiff.

## A.  The Plaintiff's Upbringing and Marriages

On June 24, 1946, the Plaintiff was born in Leipzing, East Germany.  The Plaintiff's

parents believed that their daughter should marry and bear children, but not take part in business.

Therefore, the Plaintiff's education was, for the most part, limited to art and culinary skills.

In 1971, the Plaintiff traveled to Italy with her parents.  While there, she met Edward

Strausman ("Strausman"), who was from Great Neck, New York.  Strausman owned and

operated Strausman Construction, a successful real estate construction and development

company.  In 1973, the Plaintiff relocated with Strausman to New York, and in 1974, the

Plaintiff married Strausman.  Thereafter, they had three daughters.  In 1984, the Plaintiff became

a United States citizen.

While married to Strausman, the Plaintiff was not employed and she did not take part in

managing the family finances.  Rather, she devoted her time to raising her children and

participating in activities with her temple in Great Neck.  In September 1984, the Plaintiff and

Strausman divorced.  As a result of the divorce, the Plaintiff received a generous financial

settlement.

About eight years later, in April 1992, the Plaintiff married Martin Lorber ("Lorber")

who was also from Great Neck, New York.  Lorber was a successful and influential business

man.  He owned and operated WorldWide Footwear, Inc. ("WorldWide"), which manufactured

and distributed beach footwear and slippers to North American retailers, such as J.C. Penney,

Target and Bed Bath & Beyond.  In 1999, the Plaintiff and Lorber established their residence at

59 Cornwells Beach Road in Sands Point, New York ("the 59 Cornwells Beach Road home" or "the 59 Cornwells Beach Road property").

**B.  The Plaintiff and Lorber's Credit Line with the Defendant HSBC Bank and Securities Accounts with the Defendant HSBC Securities**

During the Plaintiff's marriage to Lorber, he determined how he and the Plaintiff would invest their assets, including their marital assets and those assets that the Plaintiff inherited from her father and received from her previous marriage to Strausman.  In 1999, Lorber opened several securities accounts for the Plaintiff with the Defendant HSBC Securities.  These accounts included two securities accounts that contained primarily bond investments ("the Securities Accounts").  Lorber worked with Kevin Neville ("Neville"), a registered representative with HSBC Securities, to determine the investment strategies for the Securities Accounts.  Neville met with the Plaintiff and Lorber several times each year to discuss the status of the Securities Accounts.  As such, he was personally aware of who the Plaintiff and Lorber were and what their needs and wishes were regarding the Securities Accounts.  Until Lorber's death in August 2003, Lorber was the sole person with trading authority in the Securities Accounts.

Also in 1999, Lorber decided that WorldWide needed access to a revolving credit facility so it could meet some of the challenges of an increasingly global marketplace.  Thus, in September 1999, Lorber and the Plaintiff entered into an agreement with the Defendant HSBC Bank under which HSBC Bank extended a line of credit to Lorber and the Plaintiff as co-borrowers ("the Credit Line").  The amount of the Credit Line was $6,500,000.

The Credit Line was secured by a note in which Lorber and the Plaintiff promised to repay, on demand or at the expiration of one year, the amount of any advances under the Credit Line ("the Note").  Both the Credit Line and the Note were secured by one of the Plaintiff's Securities Accounts, which at the time contained primarily bonds worth approximately

$8,000,000 ("the Collateral Account"). Neville was the broker at HSBC Securities who managed the Collateral Account.

When Lorber and the Plaintiff secured the Credit Line, Ray Finken ("Finken") was the relationship manager at HSBC Bank. Finken was responsible for the Credit Line and all related account activity. Until 2009, Finken oversaw the Credit Line; at that time, he departed from HSBC Bank.

In this regard, Finken first met with the Plaintiff and Lorber in 1999 when they entered into the Credit Line Agreement with HSBC Bank. Over the next four years, Finken met with Lorber several times to discuss and renew the Credit Line. Finken was also responsible for sending all account statements for the Credit Line to Lorber's attention at his WorldWide office in Merrick. In this way, Finken was personally aware of who the Plaintiff and Lorber were; the purpose for which they took out the Credit Line; the manner in which payments toward the Credit Line were made; and the manner in which annual renewals of the Credit Line were effectuated.

When Lorber died in August 2003, Finken attended Lorber's funeral. This was the last time the Plaintiff ever saw Finken. At no time after Lorber's death did Finken ever meet with the Plaintiff to discuss the future use or purpose of the Credit Line, despite the fact that the Plaintiff was then the sole borrower on the Credit Line and her Collateral Account secured the Credit Line. After Finken departed HSBC Bank, Christine Givelechian ("Givelechian") became the relationship manager for the Credit Line.

Lorber periodically utilized the Credit Line in connection with WorldWide. He always timely repaid Credit Line advances and the Credit Line was never drawn to its maximum while

Lorber used it. In addition, although she was a co-borrower on the Credit Line, the Plaintiff never advanced or used funds from the Credit Line.

## C. The Defendant Winston's Relationship with the Plaintiff and her Daughter

In or about January 1999, the Defendant Winston began dating the Plaintiff's youngest daughter, Eve ("Eve"). At the time, Eve was 22 years old, while Winston was approximately 32 years old. Eve never completed college and she apparently had no knowledge of business, finance, banking or real estate. More than a year after they started dating, in April 2000, Eve and Winston married. Five months later, Eve gave birth to their first of three daughters.

According to the Plaintiff, Winston "wined and dined" Eve and promised her that his first priority was taking care of her well-being. Winston also tried to impress and endear himself to the Plaintiff, Lorber and Strausman, as well as to other members of Eve's extended family. In this regard, at some point, Winston accompanied the Plaintiff on a pilgrimage to Israel where they climbed to the top of Masada, a desert fortress that overlooks the Dead Sea. Winston told the Plaintiff that they were bonded to one another due to the experience and "that he would eternally love her as if she was his own mother." (Amend. Compl., ¶ 35.) Thereafter, Winston began referring to the Plaintiff as "mom." In turn, the Plaintiff thought of Winston as her own son.

## D. The Defendant Winston's Criminal Indictment and Conviction

In the year 2000, Winston learned that he and his securities brokerage firm, First United Equities Corporation ("First United"), were under federal investigation for securities fraud. Following this investigation, in or about March 2001, Winston was indicted and faced criminal charges before the United States District Court for the Eastern District of New York (Garaufis, J.) for securities fraud, mail fraud, wire fraud and money laundering, among other crimes. In this

7

regard, Winston was accused of high pressure and deceptive conduct in connection with purchasing and selling securities to benefit positions Winston held under nominees; threatening individuals with bodily harm; and making materially false and misleading statements to unwilling investors to induce them to purchase or sell securities. Winston subsequently pleaded guilty to conspiracy to commit securities fraud and conspiracy to commit money laundering and was sentenced on May 25, 2005 to probation for ten years. He was also ordered to make restitution in the amount of approximately $108,988,825.50 and was barred for life by the United States Securities and Exchange Commission from associating with a broker or dealer.

The Plaintiff claims that Winston convinced her, Eve and the rest of their family into believing that the criminal case against him was unjust and that he was a victim of his business partners' fraud. He also allegedly convinced the Plaintiff that his probation sentence meant that he was released from his criminal charges. According to the Plaintiff, she was not aware of the restitution order. She further asserts that she did not understand the severity of Winston's criminal judgment, nor did she understand that due to the restitution order, he would attempt to hide assets using nominees.

**E. Lorber's Death and Winston's Involvement in Managing the Plaintiff's Finances**

As stated above, on August 13, 2003, Lorber died after a year-long battle with lung cancer. One month later, in or about September 2003, the Plaintiff went to Munich, Germany, for a one-month period in order to provide her mother, who lived in Munich, with full-time care during her recovery from emergency hip surgery. The Plaintiff alleges that about this time Winston "saw the opportunity for which he had been waiting to reap the benefits of his marriage to Eve and his years spent charming her family." (Amend. Compl., ¶ 55.) He thus offered to help the Plaintiff by (1) managing the Plaintiff's finances, including but not limited to her

checking account, securities and brokerage accounts and the Credit Line; (2) maintaining oversight of certain household needs, including collecting the Plaintiff's mail; and (3) winding down and dissolving WorldWide. The Plaintiff trusted Winston, as he assured her that he had her best interests at heart.

In addition, at some point, Winston introduced the Plaintiff to the Defendant Ganz, whom Winston has been friends with for approximately fifteen years. Ganz is a certified public accountant and the sole owner of the Defendant Sheldon M. Ganz, C.P.A. Winston told the Plaintiff that Ganz would monitor her accounts in order to offer her the best possible tax advice. He also told her that Ganz was a "genius accountant" and that he would help Winston in winding down and dissolving WorldWide.

Thus, in 2004, the Plaintiff retained Ganz as her sole accountant and tax preparer. In this capacity, Ganz was permitted to access the Plaintiff's account statements, brokerage statements and taxes, among other personal information. The Plaintiff also appointed Ganz as the sole trustee for her daughters' trust accounts and for the trust accounts for her three granddaughters, who were also Winston's children.

**F. The Winhaven Enterprise and the Alleged Fraudulent Scheme**

According to the Plaintiff, once Winston assumed management of her finances, he abused his position to fraudulently borrow or outright steal funds from her in the aggregate amount of approximately $10,000,000. In this regard, in 2004, Winston established an organization called Winhaven. Due to the restitution order against him, Winston arranged that any real estate assets held by Winhaven were not held in his name. For this reason, the Plaintiff alleges, his name does not appear in connection with any Winhaven transaction. Rather, Eve's name appears in

connection with most of the Winhaven transactions.  Moreover, Winston made sure his home

with Eve was held in her name or in the name of a corporate entity.

The Plaintiff alleges that Winston "conspired" with the Defendant Tehrani, Ganz and

others "to engage in a fraudulent scheme conducted through . . . Winhaven, with the objective of

purchasing, developing and selling millions of dollars['] worth of real estate assets while hiding

the same from the federal government and defrauding numerous lenders, banks, investors and the

Internal Revenue Service in the process."  (Amend. Compl., ¶ 7.)  In this way, the Plaintiff

claims, Winston perpetrated the Winhaven Fraud.  Moreover, the Plaintiff claims that Winston,

together with Ganz and Tehrani, fraudulently used the Plaintiff's assets to further support the

fraudulent scheme.

The first Winhaven entity that Winston formed was Winhaven Associates LLC, which

was incorporated in September 2004.  According to the Plaintiff, Winston made Eve the

principal associated with Winhaven Associates LLC so as to avoid any connection between his

own name and any assets eventually held by Winhaven.  Winston and Eve's home address was

listed in the Articles of Association for Winhaven Associates LLC.  During the next several

years, Winston established more than 15 different Winhaven entities, in order to (1) pursue

various real estate ventures; (2) facilitate the transferring of funds between bank accounts

associated with the Winhaven entities; and (3) provide a corporate cover for his real estate

holdings.

At the time this action commenced, Winhaven owned and operated a number of

properties, such as the Westhampton Beach Plaza strip mall; a large residential development

known as the Fields at Mattituck; and a mixed-use building at 640 Broadway in Manhattan.

However, Metropolitan Bank, which holds the mortgage on the Westhampton Beach Plaza strip

mall, was foreclosing on the property.  Winston and Ganz allegedly enabled Winhaven to purchase these properties and others by providing false and materially misleading information to lenders, banks, institution and individual investors and federal agencies, including the Internal Revenue Service ("IRS") and the Department of Justice.

For example, Winston allegedly falsely represented to institutional and individual investors and to the HSBC Bank and HSBC Securities representatives overseeing the Plaintiff's accounts that Eve was a real estate developer.  Winston further represented that he and Eve were involved in a long history of real estate development in the Long Island and New York area that was started by Strausman, and that Eve was at the helm.   However, as suggested above, Eve actually had no experience with or knowledge of real estate development.

The Plaintiff further alleges that Ganz participated in the Winhaven Fraud by (1) lending the perceived credibility of an accountant to Winston's business; (2) serving as the Plaintiff's accountant in order to provide Winston with access to the Plaintiff's personal and financial information; and (3) preparing and filing tax returns and related information for Winhaven, Winston, the Plaintiff and other entities in a manner that would assist in concealing the Winhaven Fraud.

In addition, according to the Plaintiff, Tehrani, as Winston's assistant at Winhaven, participated in the Winhaven Fraud by providing back-office support and using her intimate knowledge of retail banking to manipulate the Plaintiff's accounts at HSBC Bank and HSBC Securities and the accounts of others at different banking institutions.  In this regard, prior to serving as Winston's personal assistant, Tehrani worked as a bank teller at the Great Neck branch of North Fork Bank, where Winston maintained Winhaven bank accounts and dealt with Tehrani frequently in connection with his banking.  In the spring of 2005, Tehrani began

working as Winston's assistant and also worked closely with Ganz. In fact, Ganz even hired Tehrani's best friend as his own personal assistant.

Tehrani served as a liaison between Winston and Ganz, and thus had access to the Plaintiff's personal and financial information. Further, on one occasion, in the Winhaven office, Eve apparently witnessed Tehrani cutting the Plaintiff's signature from a document.

## G. The Alleged Abuse of the Credit Line

After Lorber's death on August 13, 2003, the Plaintiff was the sole borrower on the Credit Line. However, she never advanced funds from the Credit Line for her own use.

Nevertheless, between fall 2003 and spring 2004, under the pretense of winding down WorldWide, Winston gained access to the Credit Line account statements, which were sent to the attention of Lorber at the WorldWide office located in Merrick, New York. In addition, about this time, he developed a relationship with Finken at HSBC Bank under the guise of paying down any advances on the Credit Line as part of winding down WorldWide. From the time Lorber died until Finken left HSBC Bank, Finken communicated solely with Winston Ganz and Tehrani about the Credit Line and never met with the Plaintiff, who was the only remaining borrower on the Credit Line, to determine its future use.

Also in about the fall of 2003 and the spring of 2004, Winston directed Finken to reroute the Credit Line account statements from the WorldWide office in Merrick to the Sheldon M. Ganz, C.P.A., P.C. office located at 98 Cuttermill Road in Great Neck, New York. Although Finken was responsible for ensuring that the Credit Line account statements were sent to the attention of the borrower at the correct address, Finken complied with Winston's request without obtaining consent from the Plaintiff. The rerouted account statements were still addressed to Lorber's attention, but care of Ganz, despite the fact that Ganz was an unapproved recipient.

12

Because the Plaintiff had never previously received Credit Line account statements while Lorber was alive, she was not aware that she should have been receiving them after Lorber's death. According to the Plaintiff, if Finken had sent her the Credit Line account statements, she may have sooner discovered the fraudulent activity associated with the Credit Line.

Thereafter, beginning in June 2004, with Ganz's assistance, Winston began withdrawing money from the Credit Line without the Plaintiff's knowledge or consent. In this regard, during the period of August 13, 2003, until June 2, 2011, the following 17 advances were made from the Credit Line: (1) $239,001.31 on June 1, 2004; (2) $250,000 on August 16, 2004; (3) $300,000 on September 23, 2004; (4) $242,881.54 on October 4, 2004; (5) $370,000 on October 6, 2004; (6) $250,000 on August 11, 2005; (7) $500,000 on August 30, 2005; (8) $250,000 on September 29, 2005; (9) $800,000 on April 13, 2006; (10) $3,500,000 on July 20, 2006; (11) $500,000 on February 9, 2007; (12) $1,500,000 on April 3, 2007; (13) $295,183.74 on April 3, 2007; (14) $500,000 on February 28, 2008; (15) $500,000 on May 27, 2011; (16) $355,000 on May 31, 2011; and (17) $40,000 on June 2, 2011. All of these advances have been repaid, except for those made on July 20, 2006, April 3, 2007, February 28, 2008, May 27, 2011, May 31, 2011 and June 2, 2011. In addition, as of September 2011, when the Plaintiff inquired about the Credit Line, on behalf of HSBC Bank, Givelechian represented that she did not have documentation supporting the 17 advances.

According to the Plaintiff, these 17 advances were fraudulently taken by Winston to support the Winhaven Fraud, with the help of Ganz and Tehrani, as well as Finken and Givelechian, as employees at HSBC Bank. The eight advances taken from the Credit Line between June 1, 2004 and September 29, 2005 totaled approximately $2,401,882.85 and were taken without the Plaintiff's knowledge or consent and by unknown means. The nine advances

taken from the Credit Line between April 13, 2006 and June 2, 2011 totaled approximately $7,990,183.74 and, according to the Plaintiff, were effectuated in one of two ways.

With respect to the first method, the Plaintiff alleges that Winston and his co-conspirators forged the Plaintiff's signature on advance requests and other related documents. As to the second method, the Plaintiff asserts that Winston and his co-conspirators obtained the Plaintiff's signature through fraud and deceit by misrepresenting the nature and purpose of the documents that she was signing. For example, in 2006 and 2007, the Plaintiff was given blank documents by Winston and Ganz. They misrepresented to the Plaintiff that the bank required these documents in order to extend Winston's time to repay a 2006 loan that the Plaintiff had given him, referred to by this Court as the Fields Loan and discussed below in more detail. These documents were later filled out by Winston, Ganz and Tehrani with specific dollar amounts and then fraudulently proffered to HSBC Bank so as to advance additional funds from the Credit Line.

In order to continue using the Credit Line without the Plaintiff discovering the abuse, Winston, Ganz and Tehrani made payments of both principal and interest in connection with the 17 advances. These payments were made from a checking account that bears the Plaintiff's name. However, the Plaintiff never opened this checking account. Rather, in spring 2007, Winston opened the account in the Plaintiff's name without her knowledge or consent. On March 14, 2012, the Plaintiff requested that HSBC Bank provide her with copies of the account-opening documents for this account, but HSBC Bank refused, stating that it was against its policy to provide signature cards, even to the purported signatory. The Plaintiff alleges that the account-opening documents do not bear her true signature or else her signature was obtained by

Winston, Ganz and Tehrani through fraud and deceit by misrepresenting the nature and purpose of what she was asked to sign.

Until 2009, when he departed from HSBC Bank, Finken was responsible for receiving and processing any advance requests made in connection with the Credit Line. He was thus aware that the abovementioned activity was occurring despite the fact that WorldWide was supposed to be on its way toward dissolution. According to the Plaintiff, Finken acted without the Plaintiff's permission in allowing and assisting Winston to advance funds from the Credit Line to support the real estate activities that were the objectives of the Winhaven Fraud.

In 2009, when Givelechian assumed responsibility for the Credit Line, she was not aware of the fraud that had already been committed with respect to the Credit Line. However, according to the Plaintiff, Givelechian failed to perform any due diligence with respect to the Credit Line. In this regard, despite knowing Lorber died in 2003, Givelechian continued to maintain the Credit Line in Lorber's name and to send account statements in Lorber's name, care of Ganz. In addition, Givelechian met only with Winston and Ganz and never with the Plaintiff.

At their first meeting with Givelechian, Winston and Ganz represented to her that they were part of a family real estate development company and that the Plaintiff permitted the use of her Credit Line to support the family's real estate ventures. Without any documentation or authorization from the Plaintiff, Givelechian assumed this was simply the manner in which the family conducted business and went along with what she was told. She thus permitted advances on and extensions of the Plaintiff's Credit Line based on representations made by Winston and Ganz. Further, Givelechian was led to believe that Tehrani was Eve Winston when she corresponded with Tehrani regarding advances and wire transfers.

In or about 2011, Givelechian spoke to and corresponded directly with Winston, Ganz and Tehrani concerning renewing the Credit Line. Specifically, she discussed with them (1) the 2011 Credit Line renewal agreement, dated May 31, 2011; (2) the accompanying Statement of Purpose for an Extension of Credit Secured by Margin Stock agreement, dated May 31, 2011; and (3) three advance requests, two dated May 27, 2011 and one dated June 2, 2011. Further, with respect to the May 27, 2011 advance requests, Winston, Ganz and Tehrani inquired of Givelechian about the availability of additional funds because the total amount of these advances requests actually exceeded the available funds on the Credit Line.

At Winston and Ganz's request and without the Plaintiff's authority, Givelechian processed the 2011 Credit Line renewal agreement along with the associated increase in funds with the understanding that these additional funds would be advanced immediately following the increase. Allegedly, Tehrani copied, cut and pasted the Plaintiff's signature on these documents so that Givelechian would process the Credit Line's renewal and the advance requests. These advance requests were wired to accounts associated with Winhaven.

In or about the summer of 2011 or the fall of 2011 and until the spring of 2012, Winston ceased making regular interest payments on the Credit Line, which, in turn, (1) caused damage to the Plaintiff's credit rating; (2) led to compounded interest debt to incur on the Credit Line; and (3) placed the securities in the Plaintiff's Collateral Account at risk of being seized by HSBC Bank in order to satisfy the delinquent Credit Line. In fall 2011, when Givelechian stopped receiving interest payments and answers to her demands from Winston, Ganz and Tehrani, she went after the Plaintiff to collect the payments and penalties owed. Further, in the spring of 2012, HSBC Bank threatened several times to seize and sell the securities in the Collateral Account if payments on the Credit Line were not made.

16

## H.  The 2006 Fields Loan

In early 2006, Winston advised the Plaintiff that he was putting the First United case behind him and starting a new career path.  Specifically, Winston told the Plaintiff that he was interested in purchasing, developing and selling real estate and that he was going to be "bigger than Donald Trump."  (Amend. Comp., ¶ 23.)  As such, Winston asked the Plaintiff for a loan in the amount of $6,000,000 to be used by Winhaven to purchase Fields at Mattituck, which was a luxury residential development site located on the North Fork of Long Island.  Winston promised the Plaintiff he would repay the loan in six months to one year.  Further, in consideration of the loan, the Plaintiff would receive a 25% ownership interest in all of his real estate holdings.  In addition, Winston advised the Plaintiff to effectuate the loan by lending Winston the money from the Credit Line.

The Plaintiff agreed to loan Winston the money from her Credit Line based on his promise that he would (1) repay the entire amount within six months to one year and (2) grant her a 25% ownership interest in his real estate holdings ("the Fields Loan").  At the time, the Plaintiff was unaware that her Credit Line had been continuously abused since June 2004 and that Winston and Ganz had already advanced approximately $2,500,000 from the Credit Line.  Further, according to the Plaintiff, Winston decided to ask the Plaintiff for the Fields Loan in order to cover up the advances he had already withdrawn from the Credit Line.

## I.  The Alleged Abuse of the Collateral Account, IRA Account and Securities Accounts

After Lorber died, Neville at HSBC Securities permitted Winston and Ganz to trade in the Securities Accounts, even though the Plaintiff never gave Ganz, Winston or anyone else permission to trade in those accounts.  Nevertheless, Neville met with Winston several times each year to discuss trading strategies and securities picks, despite the fact that Winston was a

convicted felon barred from associating with a broker-dealer. At his meetings with Winston, Neville always had the account statement for the Collateral Account available, which detailed the allocation of securities in the Collateral Account.

Of importance, Neville was aware of the advances that were being taken from the Credit Line because Finken and Givelechian communicated with Neville concerning the collateral available to secure the Credit Line. He was also aware that Winston and not the Plaintiff was advancing funds from the Credit Line.

At some point after 2004, Ganz told the Plaintiff that he needed online access to the Securities Accounts for unspecified "tax purposes." Ganz and Winston allegedly accessed the Securities Accounts online to ensure that the Collateral Account was sufficient to support their continuous fraudulent advances from the Credit Line.

Further, the account statements for the Securities Accounts that Neville sent to the Plaintiff never specified that the securities contained in the Collateral Account were specifically encumbered or what percentage of the securities was pledged to the corresponding outstanding balance on the Credit Line. As such, when the Plaintiff received her Collateral Account statements and saw nothing had substantially changed with respect to the value, the Plaintiff relied on those statements in believing that the Collateral Account was unencumbered and therefore safe. In this way, according to the Plaintiff, Neville omitted material information with respect to the Collateral Account that would have, at a minimum, affected the Plaintiff's investment choices and made her aware of the fraudulent activity relating to the Securities Accounts and the Credit Line.

In addition, from 2008 until 2010, Winston and Ganz advised the Plaintiff with respect to her Will and other inheritance plans for her children and grandchildren. They advised the

Plaintiff that she should leave the Collateral Account untouched so that it could grow, rather than dividing the account into various trusts for her children and grandchildren as the Plaintiff wanted to do. In this regard, Winston and Ganz misrepresented that the nature of the investments in her Collateral Account was such that the investments would not provide the same growth and benefit if placed into several different accounts.

However, as already indicated above, the Collateral Account was actually being used by Winston, Ganz and Tehrani to collateralize the Credit Line. Thus, in advising the Plaintiff, Winston and Ganz intended to ensure that sufficient collateral was available to support their fraudulent advances from the Credit Line in furtherance of the Winhaven Fraud. Specifically, Winston and Ganz knew that any significant changes to the Collateral Account would have alerted the Plaintiff to the substantial balance outstanding on the Credit Line.

Furthermore, when the Plaintiff required additional money, Ganz advised her to sell securities in her IRA Account rather than the Collateral Account, on the ground that the tax consequences from withdrawing funds from the Collateral Account would be significant. However, the tax consequences of withdrawing from the IRA Account were worse than those associated with withdrawing from the Collateral Account, and, as a result of the withdrawals from the IRA Account, the Plaintiff has incurred a significant tax liability with the IRS. For example, with respect to her 2011 tax returns, the Plaintiff paid $109,801 in taxes related to withdrawals from her IRA Account that she had made based on advice from Ganz.

The Plaintiff claims that Ganz misrepresented the true tax consequences of withdrawing funds from the IRA Account instead of the Collateral Account because he was attempting to protect the Collateral Account for the benefit of Winston and the Winhaven Fraud. The Plaintiff further claims that Ganz masked the tax consequences relating to withdrawals from the

Plaintiff's Account prior to 2011 by offsetting those tax liabilities with business losses claimed in connection with his and Winston's fraudulent activities concerning WorldWide and Amphitrite LLC, discussed further below.

## J. Winston's Purchase of the Plaintiff's Home

In April 2007, Winston purchased from the Plaintiff her 59 Cornwells Beach Road home so that he could live there with Eve and their children. He purchased the home in Eve's name. Prior to purchasing the 59 Cornwells Beach Road home, Winston told the Plaintiff that he would build her a smaller house on the same property because he thought of her as his own mother and he wanted to ensure she was cared for properly. However, according to the Plaintiff, Winston really wanted to keep the Plaintiff under his control so that he could further manipulate her and her finances.

The Plaintiff and Winston arranged that he would pay $50,000 of the $6,000,000 purchase price for the 59 Cornwells Beach Road property until he could sell his prior home. Two years went by without any further payment. The Plaintiff asserts that Winston failed to make a good faith effort to sell his prior home and turned down several bona fide offers.

In 2009, the Plaintiff determined that zoning would not permit her to build a smaller house on the 59 Cornwells Beach Road property. She thus decided to buy her own house nearby, as she did not feel she could live peacefully in the same house as the three young children. Accordingly, in early 2009, the Plaintiff purchased a home located at 3 Cedar Lane in Sands Point, New York ("the 3 Cedar Lane home" or "the 3 Cedar Lane property"), which was a short distance from the 59 Cornwells Beach Road home. Winston agreed to pay for the purchase of the 3 Cedar Lane home on the Plaintiff's behalf in order to satisfy a portion of the purchase price for the 59 Cornwells Beach Road property.

On March 30, 2009, a fax was sent to HSBC Bank instructing HSBC Bank to provide seven checks to various entities that constituted the sellers of the 3 Cedar Lane property. The fax was purportedly from Eve. However, Eve did not send the fax and she did not know it was sent on her behalf. Rather, the fax trail indicates it came from the Winhaven Group. According to the Plaintiff, Winston used funds from Eve's trust account and checking account, as well as the Credit Line, to pay for the purchase of the 3 Cedar Lane property without the knowledge or consent of the Plaintiff or Eve.

In addition, in further satisfaction of the purchase price for the 59 Cornwells Beach Road property, Winston and Ganz handled and paid for a portion of the July 2011 purchase of the Plaintiff's Manhattan apartment, located at 900 Fifth Avenue, New York, New York. The funds for purchasing this apartment came in part from Eve's trust account without Eve's knowledge or consent. The funds also came from money that was misappropriated from the Credit Line. At the time this action commenced, Winston still owed the Plaintiff $500,000 for the purchase price of the 59 Cornwells Beach Road home.

**K.  The 2008 Boat Loan**

At some point prior to May 2008, Winston involved the Plaintiff in his purchase of a new yacht. In this regard, Winston and Ganz convinced the Plaintiff to agree to serve as the sole member of a holding company for the new yacht and to act personally as a guarantor for the loan on the yacht. Specifically, Ganz advised the Plaintiff that owning a yacht through a company was safe and would provide significant tax savings and other benefits for her. In addition, Winston assured the Plaintiff that he had plenty of money to afford the new yacht and that he would make the monthly payments.

In May 2008, Winston formed Amphitrite LLC.  In the Amphitrite LLC Limited Liability Company Agreement ("Amphitrite LLC Agreement") the Plaintiff is named as the sole member, but the address listed in the articles of association is 98 Cuttermill Road in Great Neck, New York, care of Sheldon Ganz.  Thereafter, Amphitrite LLC purchased a 75-foot 2008 Azimut yacht.  The yacht was also called the Amphitrite.  Winston financed the purchase of the Amphitrite with a loan from Bank of America in the amount of $3,153,733 (the "Boat Loan").  The Boat Loan was extended to Amphitrite LLC and guaranteed by the Plaintiff by the Simple Interest Loan Note, Disclosure and Security Agreement, dated May 21, 2008 (the "Boat Loan Agreement").  When the Plaintiff signed the Boat Loan Agreement, she understood that Winston would make the monthly payments and that Ganz would ensure she received the tax benefits and savings he had promised.  Also on May 21, 2008, while the accompanying Affidavit of State Execution and Delivery of Promissory Note evidencing the Boat Loan was signed by the Plaintiff, the notarization of this document occurred outside of the Plaintiff's presence, despite the notary's affidavit stating that the Plaintiff appeared in person.  According to the Plaintiff, Winston obtained numerous false notarizations on documents bearing the Plaintiff's signature.

By the terms of the Boat Loan Agreement, the monthly payment for the Boat Loan was approximately $22,576.42.  Without the Plaintiff's knowledge or consent, Winston opened a bank account at HSBC bank in the name of Amphitrite LLC so that he could fund the account to make the monthly loan payments ("the Amphitrite LLC Account").  All account statements for the Amphitrite LLC Account were sent to Ganz at his Great Neck address.

Ganz was responsible for making, or directing Tehrani to make, the payments on the Boat Loan.  To that end, Tehrani transferred funds from Eve's checking account and various Winhaven accounts to the Amphitrite LLC Account in order to make payments on the Boat

Loan.  Certain funds used to make these payments originally came from the advances from the Credit Line.

Winston, Ganz and Tehrani made the monthly payments on the Boat Loan from the Amphitrite LLC Account until fall 2011, when several payments were missed or rejected due to insufficient funds in the Amphitrite LLC Account.  In addition, when they were making payments on the Boat Loan, Winston, Ganz and Tehrani made late payments and allowed the Amphitrite LLC Account to run consistently at a deficit, incurring many charges for late fees and insufficient account funds.

In the fall of 2011, after the Boat Loan went unpaid for several consecutive months, Bank of America contacted the Plaintiff for payment.  The Plaintiff could not afford to make the monthly Boat Loan payments, nor was she expected to make such payments in her agreement with Winston.  In February 2012, Bank of America exercised its right under the Boat Loan Agreement to repossess the Amphitrite.  On February 27, 2012, the Plaintiff received notice of the repossession and intent to sell.

At the time of the repossession, the balance on the Boat Loan was $2,898,677.71.  In an effort to save her credit rating and avoid the foreclosure process, the Plaintiff began exploring the possibility of assuming the monthly payments and retaking possession of the Amphitrite with the hope of selling it herself for a higher price than what Bank of America endeavored to obtain. However, after determining that there was no way she could afford the monthly payments and realizing that any sale of the Amphitrite would result in a significant deficiency, the Plaintiff relinquished the Amphitrite.  At the time this action was commenced, the Plaintiff was awaiting news of the deficiency total from Bank of America.  Bank of America estimates that the deficiency following the sale of the Amphitrite will be more than $1,000,000.

The Plaintiff's credit was severely blemished by the repossession and charge-off related to the Boat Loan. After the charge-off relating to the Boat Loan reflected on the Plaintiff's credit, in May 2012, American Express revoked two credit cards that the Plaintiff had held for approximately ten years, even though the Plaintiff had never missed or been late with a payment.

In addition, Ganz prepared financials and taxes for Amphitrite LLC, which have been abandoned and left to accumulate debts. In this regard, the Plaintiff alleges that Winston and Ganz manipulated Amphitrite LLC to run at a loss for tax purposes. Moreover, since the tax period ending June 30, 2010, Winston and Ganz have failed to ensure that certain taxes were paid for Amphitrite LLC.

On April 16, 2012, the Plaintiff received a Notice of Intent to Levy and Notice of Your Right to a Hearing from the IRS ("the IRS Notice"). The IRS Notice indicated that certain unpaid taxes in the amount of $38,953.04 were outstanding for Amphtrite LLC. It further indicated that quarterly federal tax returns and federal unemployment tax returns had not been filed for the period ending December 31, 2010 or any time thereafter. These past-due tax payments appear to concern employee-related taxes for the captain and first mate that Winston hired and employed on the Amphitrite through Amphitrite LLC. On April 24, 2012, the Plaintiff also received a document from the IRS which indicated that Amphitrite LLC owed $15,870 in employee trust-related taxes, such as FICA withholdings.

To avoid having liens taken against her home or apartment, the Plaintiff and her current accountant worked with the IRS to determine the outstanding taxes owed pursuant to the IRS Notice. On or about June 6, 2012, the Plaintiff wrote approximately 15 checks payable to the IRS totaling $62,111.64 in satisfaction of the IRS Notice. However, this payment did not

include any penalties assessed by the IRS, which were still being determined at the time this action was commenced.

**L.  The Alleged Failure to Wind Down WorldWide by Winston and Ganz**

Winston and Ganz represented to the Plaintiff that they sold the WorldWide office in Merrick sometime in 2005.  Winston and Ganz further represented to the Plaintiff that all inventory was disposed of; all accounts were settled; and WorldWide was effectively closed sometime in 2006.  However, Ganz prepared WorldWide tax returns for 2007, 2008 and 2009.  The 2009 WorldWide tax returns indicate that WorldWide's business address was Ganz's office in Great Neck.  The 2009 WorldWide tax return also indicated that the Plaintiff was the sole shareholder of WorldWide and that her address was 59 Cornwells Beach Road, Sands Point, New York, even though the Plaintiff no longer lived at that address.  Rather, at that time, Winston was living at that address.

In WorldWide's 2009 tax returns, Ganz declared an ordinary business loss in the amount of $204,543, which was attributed to interest.  In turn, the interest was attributed to liability line items listing (1) a mortgage, note or bond payable within one year in the amount of $1,825,080 and (2) a shareholder loan in the amount of $3,239,775 payable by year end.  However, the Plaintiff, as the sole shareholder of WorldWide, never extended any shareholder loans to WorldWide, which she believed had ceased operations and dissolved three years prior.   Rather, the Plaintiff alleges that Winston and Ganz declared the funds they fraudulently advanced from the Credit Line as shareholder loans for WorldWide, and then deducted the interest as a business loss for WorldWide.  None of the money fraudulently advanced from the Credit Line went to WorldWide, as it had no operating activity.  Instead, the money went to Winhaven to support the Winhaven Fraud.

Further, on the Plaintiff's 2009 personal tax returns, Ganz declared WorldWide's loss of $204,543 as a "non-passive loss" associated with WorldWide. The Plaintiff claims that she did not understand her tax returns and never realized that Ganz declared WorldWide losses after she believed WorlWide was dissolved. She relied on Ganz to accurately and truthfully prepare her taxes. Before she discovered the Winhaven Fraud, she never had reason to believe that Ganz was unreliable.

In 2011, a tax lien was filed against WorldWide, but the nature of the lien is unknown to the Plaintiff. In January 2012, WorldWide finally dissolved by decree.

**M.  The 2011 640 Broadway Loan**

In June 2011, Winston approached the Plaintiff for a $500,000 loan to post as a bond in connection with Winhaven's purchase of the building located at 640 Broadway, New York, New York ("the 640 Broadway property"). Winston told the Plaintiff he would repay the loan within two weeks, during which time he knew the Plaintiff would be travelling to Munich to settle the affairs of her recently-deceased mother. Winston also promised the Plaintiff a 25% ownership interest in the 640 Broadway property in exchange for the loan. Unaware that her entire Credit Line had been advanced by Winston, the Plaintiff agreed to lend Winston the $500,000 ("the 640 Broadway Loan").

To effectuate the 640 Broadway Loan, Winston instructed Neville to liquidate $500,000 worth of bonds from the Plaintiff's uncollateralized Securities Account and to transfer the proceeds to Winston. The Plaintiff never gave Neville permission to liquidate the bonds or to transfer the proceeds to Winston. The loan was used by Winston to continue with the financing process required for Winhaven's purchase of the 640 Broadway property. This process included forging Eve's signature on various documents and providing false financial information to M&T

Bank, the seller and other investors and financiers.  The Plaintiff claims that Winston never intended to repay the 640 Broadway Loan, and at the time this action was commenced, he had not repaid it.

### N.  The Plaintiff's Discovery of the Winhaven Fraud

In July 2011, the Plaintiff returned to New York after dealing with her mother's death in Munich, Germany.  At that time, she asked Winston about the 640 Broadway Loan.  She also called Ganz to inquire about it.  This phone call allegedly caused a disagreement between Ganz, Winston and Eve, because with the Credit Line advanced to its maximum, Winston was running out of time and money to close the deal on the 640 Broadway property.  Further, about this time, Eve began exploring the possibility of divorcing Winston.

Also in July 2011, the Plaintiff began an investigation, which lasted several months.  During the investigation, the Plaintiff discovered that Winston, Ganz and Tehrani had abused her Credit Line and fraudulently induced her to enter into the Boat Loan Agreement to allow Winston to maintain his façade as a successful real estate developer.

At this time, in the hope of avoiding any harm to Eve and her granddaughters, the Plaintiff asked Winston to (1) make good on his promise to pay the Boat Loan; (2) pay off the Credit Line; and (3) repay the $500,000 bond loan.  In response, Winston threatened the Plaintiff and Eve that he would never repay the Plaintiff unless the Plaintiff and Eve stopped getting involved and allowed him to handle matters his way.  In this regard, in February 2012, Winston sent several text messages to Eve, which included the following admissions:

> - "What is so bad about ackkwoledging [sic] that I am responsible and owe your mother money."
> - "Have you ever once sat down and said, fuck the lawyers, I swear I Won't [sic] betray you, won't send docs to anyone so gov't can't get, won't hurt you, wjat can I do to help? [sic]"

- "I am on the plane. Bad timing leaving now. I had to. I could not in consciense [sic] let Ron wire me 17 million for a deal with the instability going on . . . . one transaction makes all this ugliness disappear forever . . . When the deal was ready, you brought up criminal, and telling the kids and I freaked. I am sorry. I was working on closing 4 huge deals and out of the 50 million I was getting from Ron and a Beverly Hill s [sic] investor who I have known for 20 yrs. 50 was going in and another 20 was going to me upfront to clean up everything."
- Do you know what you have done with Info I have given you. [sic] Do you know what you have threatened me with. [sic] Do you know how it hurt my children that you wouldn't cooperate with me and help me close. [sic] People are trying to help us and I have to worry what your [sic] capable of. I have had it with the hanging up and threatening me criminally . . . ."
- "If you go to lawyers [sic], then you do. I am not begging you, you only want everyone to feel sorry for you. I am 10 times mor protect [sic] in a divorce than I am now. I will not pay boat [sic], your mother or house or any other fucking cent. I will have the lawyers deal with everything . . . ."
- "You want the money figured out and the kids told. All about you and your confidants planning how to proceed. Faxing emails and financial info to lawyers. Oh the same lawyers as your mother. No regard when I tell you this not smart because of the government. Which by the way if we have a public fight will be nothing anyone can stop."

(Amend. Compl., ¶ 223.)

On June 25, 2012, the Plaintiff directed her new financial advisors to pay off the Credit Line with HSBC Bank and to assume control of the Collateral Account in order to mitigate the damages in connection with the Credit Line and to protect the Collateral Account, which serves as her primary source of income.

As a result of the alleged Winhaven Fraud, the Plaintiff suffered the following financial damage: (1) $6,395,000, plus associated interest and penalties, from the advances Winston took from the Plaintiff's Credit Line; (2) approximately $1,000,000, plus associated interest and penalties, for the imminent deficiency on the Boat Loan; (3) $500,000, plus interest, for the Bond Loan posted for the purchase of the 640 Broadway property; (4) $65,000 in taxes, plus associated

interest and penalties, that are owed for Amphitrite LLC; (5) taxes owed in connection with withdrawals from the Plaintiff's IRA Account based on the false tax advice given by Ganz, including but not limited to the amount of $109,801 owed in 2011 and any amounts owed in years prior, plus associated interest and penalties; (6) $500,000, plus interest, for the remainder of the purchase price for 59 Cornwell's Beach Road property; (7) additional interest, fees or penalties associated with the foregoing; and (8) any additional debts incurred by Winston in the Plaintiff's name, or any additional funds fraudulently obtained by Winston from the Plaintiff in furtherance of the Winhaven Fraud that were not yet known at the time this action commenced.

In addition, the Plaintiff's credit suffered significantly due to the repeated late and missed payments made on the Credit Line and the Boat Loan, as well as by the repossession of the Amphitrite and subsequent charge-off concerning the Boat Loan. The Plaintiff claims that it will take her years to rebuild her credit and that she is disadvantaged in the process because of her age and income prospects. She further alleges that as a result of the Winhaven Fraud, she has suffered from stress, fatigue, anxiety and panic attacks.

## II. DISCUSSION

### A.  The Legal Standard under Fed. R. Civ. P. 12(b)(6)

It is well-established that a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). Indeed, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)). "'Determining whether a complaint states a

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1949–50, 173 L. Ed. 2d 868 (2009)).

In deciding a motion to dismiss, a court is required to accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Iqbal, 556 U.S. at 678; Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007).  As such, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief."  Iqbal, 556 U.S. at 679.  However, "although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Harris, 572 F.3d at 72 (quoting Iqbal, 556 U.S. at 678).  In its analysis, the Court may refer "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in [a] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit."  Brass v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also Karmilowicz v. Hartford Fin. Servs. Group, 494 F. App'x 153, 156 (2d Cir. 2012).

## B.  The Legal Standard under 18 U.S.C. § 1962(c)

The statute of limitations for a civil RICO claim is four years.  Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013)  (citing Rotella v. Wood, 528 U.S. 549, 552, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000), and Agency Holding Corp. v. Malley–Duff & Assocs., 483

U.S. 143, 156, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987)).  Under the substantive RICO statute,

18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any

enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity . . . ."   In other words, to establish a civil RICO violation under 18 U.S.C. § 1962(c), a

plaintiff must show: "(1) that the defendant (2) through the commission of two or more acts (3)

constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or

participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign

commerce."  Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983); see also Zavalidroga v.

Cote, 395 F. App'x 737 (2d Cir. 2010).

        "For an association of individuals to constitute an enterprise, the individuals must share a

common purpose to engage in a particular fraudulent common course of conduct and work

together to achieve such purposes."  First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159,

174 (2d Cir. 2004); see also 18 U.S.C. § 1961(1)(B).  "'Racketeering activity' is broadly defined

to encompass a variety of state and federal offenses including, inter alia, murder, kidnapping,

gambling, arson, robbery, bribery and extortion."  De Falco v. Bernas, 244 F.3d 286, 306 (2d

Cir. 2001).  "Pattern of racketeering activity" is defined as "at least two acts of racketeering

activity . . . within ten years . . . after the commission of a prior act of racketeering activity."  18

U.S.C. § 1961(5).  "The compensable 'injury' is 'the harm caused by predicate acts sufficiently

related to constitute a pattern.'"  Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc., 10–CV–1762

(RER), 2013 WL 168079, at *5 (E.D.N.Y. Jan. 16, 2013) (quoting Sedima S.P.R.L. v. Imrex Co.,

473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)).

Further, the Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct" of an enterprise "one must participate in the operation or management of the enterprise itself." <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). In the Second Circuit, the "'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage." <u>First Capital</u>, 385 F.3d at 176 (2d Cir. 2004) (citing <u>Baisch v. Gallina</u>, 346 F.3d 366, 377 (2d Cir. 2003), and <u>De Falco v. Bernas</u>, 244 F.3d 286, 309 (2d Cir. 2001)). However, in order to clear this hurdle, a plaintiff must show that the RICO defendants played "some part in directing [the enterprise's] affairs." <u>Id.</u> (quoting <u>De Falco</u>, 244 F.3d at 310).

## C.  The Legal Standard under Fed. R. Civ. P. 9(b)

It is well-settled that a complaint alleging fraud must comply with the heightened pleading standard under Fed. R. Civ. P. 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity." <u>See</u> Fed. R. Civ. P. 9(b); <u>see also</u> <u>Ganino v. Citizens Util. Co.</u>, 228 F.3d 154, 168 (2d Cir. 2000). "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[s] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" <u>Cohen</u>, 711 F.3d at 359 (citing <u>Caputo v. Pfizer, Inc.</u>, 267 F.3d 181, 191 (2d Cir. 2001)); <u>see also</u> <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006). In addition, the complaint must "provide some minimal factual basis" that gives rise to a strong inference of fraudulent intent. <u>Powers v. British Vita, P.L.C.</u>, 57 F.3d 176, 184 (2d Cir. 1995).

Of importance, "all allegations of fraudulent predicate acts [] are [also] subject to the heightened pleading requirements of [Rule] 9(b)." <u>First Capital,</u> , 385 F.3d at 178. In the instant

litigation, the Plaintiff alleges the following predicate criminal acts by the Defendants Winston, Ganz and Tehrani: (1) mail fraud in violation of 18 U.S.C. § 1341; (2) wire fraud in violation of 18 U.S.C. § 1343; (3) bank fraud in violation of 18 U.S.C. § 1344; (4) laundering of monetary instruments in violation of 18 U.S.C. § 1956; and (5) engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

**D.  As to Whether the Plaintiff's Civil RICO Claim Brought Against the Defendants Winston, Ganz,  is Barred by the Statute of Limitations**

As stated above, "RICO claims are subject to a four-year statute of limitations." Koch v. Chrisite's Intern. PLC, 699 F.3d 141, 148 (2d Cir. 2012) (citations omitted).  This "four-year statute of limitations 'begins to run [on a RICO claim] when the plaintiff discovers – or should have reasonably discovered – the alleged injury.'" World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697 (2d Cir. 2009) (quoting McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 233 (2d Cir. 2008)).  In this regard, "[t] he RICO statute of limitations . . . runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." Jakks, 328 F. App'x at 697 (citing Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 427 (2d Cir. 2008)).  Thus, "once there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred." Koch, 699 F.3d at 153.

However, "[t]he existence of 'storm warnings' sufficient to trigger inquiry notice does not begin the clock when the plaintiff actually pursues an investigation." Id.  In other words, this means that "the statute of limitations begins to run, in the case of a [plaintiff] who undertook a reasonable effort of inquiry once 'storm warnings' had been posted, when a reasonable [person] would have discovered the facts necessary to bring a cause of action." In re Global Crossing,

Ltd. Securities Litigation, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003). Conversely, "[i]f [a plaintiff] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty [to inquire] arose." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003).

"Whether a plaintiff has such 'inquiry notice' or 'constructive notice' is judged under an objective standard and requires an evaluation of the totality of the circumstances." Marshall v. Milberg LLP, 07 CIV. 6950 (LAP), 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009) (citing Staehr, 547 F.3d at 427); see also In re Prudential Securities Inc. Ltd. Partnerships Litigation, 930 F. Supp. 68 (S.D.N.Y. 1996) (citing Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983)) ("[T]he test of inquiry notice is objective."). Specifically, "[i]nquiry notice means that sufficient facts exist to suggest to a plaintiff of normal intelligence that wrongdoing is 'probable, not merely possible.'" Marshall, 2009 WL 5177975, at *3 (quoting Shah v. Meeker, 435 F.3d 244, 249 (2d Cir. 2006)). In other words, "knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive." Koch, 699 F.3d at 153.

Of importance "[a] plaintiff need not have notice of all of the relevant details or know about 'the entire fraud being perpetrated to be on inquiry notice,' but instead merely must be aware of the 'general fraudulent scheme[.]'" Marshall, 2009 WL 5177975, at *3 (citations omitted). Further, the Second Circuit has held that "'[t]he means of knowledge are the same thing in effect as knowledge itself,'" and therefore, "when the circumstances would suggest to a [person] of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the [plaintiff] who does not make such an inquiry." Dodds v. Cigna Securities, Inc., 12 F.3d 345, 350 (2d Cir. 1993) (quoting Armstrong, 699 F.2d at

88 (2d Cir. 1983)); see also Koch, 699 F.3d at 153 ("[W]hen a RICO plaintiff 'makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose.'") (quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 169 (2d Cir. 2005)).

While a "[c]ourt[ ] may determine as a matter of law whether inquiry notice existed in a particular case," it should not dismiss a complaint on this basis unless "'uncontroverted evidence clearly' supports such a finding."  Marshall, 2009 WL 5177975, at *3 (quoting Staehr, 547 F.3d at 427).  Accordingly, "making this determination is frequently inappropriate on a motion to dismiss" and is only "proper . . . when the complaint and documents which the court may take notice of clearly show that the claims are barred as a matter of law."  Id. (citing Staehr, 547 F.3d at 425, and LC Capital Partners, 318 F.3d at 156.  In addition, the court may "take judicial notice of news coverage and prior lawsuits without converting a motion to dismiss into a motion for summary judgment" by "simply noting the existence of the information without considering it for the truth of the matters asserted therein."  Id. (citing Staehr, 547 F.3d at 425).

In this case, the Plaintiff brings her civil RICO claim against the Defendants Winston, Ganz and Tehrani for fraudulent activity that allegedly began in the fall of 2003 and continued until the commencement of this action on July 18, 2012.  She claims she did not discover the fraudulent activity until the fall of 2011, and therefore the commencement of this action on July 18, 2012 was timely.

However, Winston, Tehrani and Ganz argue that the Plaintiff's claim is time-barred because she was on inquiry notice before July 18, 2008, and thus, more than four years prior to when she brought this action.  More particularly, they point to the following alleged facts that should have suggested to the Plaintiff that she was being defrauded:  (1) Winston's arrest and indictment in 2001 for securities fraud, wire fraud, mail fraud and money laundering; (2)

Winston's 2005 conviction, sentence of ten-years of probation and $108.9 million restitution order; (3) HSBC Bank's silence from 2004 to 2008 regarding her multi-million dollar Credit Line, in that in all those years, the Plaintiff never received an account statement nor heard from any HSBC Bank representative concerning the Credit Line; and (4) that in 2006 and 2007, the Plaintiff agreed to sign blank documents offered to her by Winston and Ganz. Winston, Tehrani and Ganz also contend that the Plaintiff did not exercise due diligence, because despite the fact that she had agreed to lend Winston $6,000,000 from the Credit Line in 2006, she did not inquire about the Credit Line with HSBC Bank until approximately five years later, when she contacted Givelechian in September 2011.

In addition, Winston, Ganz and Tehrani request that this Court convert their present motions to dismiss to summary judgment pursuant to Fed. R. Civ. P. 12(d) so that it may consider 2007 documents concerning WorldWide that the Plaintiff allegedly received, as these documents are outside the pleadings. Concerning this, they argue that the Court should consider these documents, because they are additional "storm warnings," which would have suggested to the Plaintiff that WorldWide was still operating in 2007 even though Winston and Ganz had previously represented to her that WorldWide had dissolved in 2006.

For her part, the Plaintiff asserts that no reasonable person would have discovered the alleged Winhaven Fraud until fall 2011 and that Winston, Tehrani and Ganz's fraudulent concealment of the Winhaven Fraud tolled the statute of limitations. In this regard, "[i]f [a] [p]laintiff[ ] can satisfy the elements of fraudulent concealment, then the statute of limitations may be tolled[.]" Maine Street Associates v. Manko, 179 F. Supp. 2d 339, 346 (S.D.N.Y. 2002). The elements of fraudulent concealment are as follows:

> [A] plaintiff may prove fraudulent concealment sufficient
> to toll the running of the statute of limitations if he establishes (1)

> that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part.

Id. (quoting State of New York v. Hendrickson Brothers, Inc., 840 F.2d 1065 (2d Cir. 1988), cert. denied, 488 U.S. 848, 109 S. Ct. 128, 102 L. Ed. 2d 101 (1988)).  She also opposes converting the Defendants' motions to dismiss to summary judgment.

As an initial matter, the Court will first address whether it will convert the motions to dismiss to motions for summary judgment and consider the 2007 documents, which are outside the pleadings.  Pursuant to Fed. R. Civ. P. 12(d), where matters outside the pleadings are presented in connection with a Rule 12(b)(6) motion, "a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'"  Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (quoting Fonte v. Bd. of Managers of Continental Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)).  When a district court decides to convert a Rule 12(b)(6) motion to a motion for summary judgment, the court must "give sufficient notice to an opposing party and an opportunity for that party to respond."  Hernadez v. Coffey, 582 F.3d 303 (2d Cir. 2009) (citation and internal quotation marks omitted).  However, "formal notice is not required where a party 'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings.'"  Hernandez, 582 F.3d at 303 (quoting In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985)).

In this regard, "[a] party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985). Thus, a district court need not give notice when it is converting a Rule 12(b)(6) motion into a Rule 56 motion when "it is clear from the record . . . that [the parties] knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions." Reliance Ins. Co. v. PolyVision Corp., 474 F.3d 54, 57 (2d Cir. 2007).

Nevertheless, in this case, "[t]he Court declines to convert this motion to dismiss into one for summary judgment because," at the time the Defendants' motions were filed, "[the] Plaintiff[ ] ha[d] not [yet] had the opportunity to conduct discovery." Snyder v. Fantasy Interactive, Inc., No. 11 Civ. 3593(WHP), 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012) (citations omitted). Indeed, "[d]iscovery is ongoing in this matter and it is not likely that sufficient evidence can be garnered at this juncture to properly consider a motion for summary judgment." Krapf v. Prof'l Collection Servs., Inc., 525 F. Supp. 2d 324, 326 (E.D.N.Y. 2007). Therefore, since the 2007 documents are outside the pleadings, this Court will not consider them at this stage, as such evidence is inappropriate for consideration on a 12(b)(6) motion to dismiss. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal question marks omitted) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."); Hahn v. Rocky Mt. Express Corp., No. 11 Civ. 8512 (LTS)(GWG), 2012 U.S. Dist. LEXIS 100466, at *4–5 (S.D.N.Y. June 16, 2012) (citation and internal quotation marks and alterations omitted) ("When deciding a motion to

dismiss, the Court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. Evidence outside these parameters may be introduced in connection with a motion for summary judgment; it cannot, however, be considered on review of a 12(b)(6) motion.").

However, with respect to the other "storm warnings" that Winston, Tehrani and Ganz glean from the Plaintiff's Amended Complaint, the Court finds that the Plaintiff was aware of sufficient facts that would have suggested to a person of ordinary intelligence that she was being defrauded, and as such, she had a duty to inquire. See LC Capital Partners, 318 F.3d at 154. First, the Plaintiff admits that she was aware of the criminal case against Winston. The indictment involved 49 counts, including securities fraud, money laundering, wire fraud and mail fraud. Although the scheme at the center of Winston's criminal case differs in some respects from the alleged Winhaven Fraud, it nonetheless showed Winston engaging in fraudulent conduct for financial gain. In fact, in the Amended Complaint, the Plaintiff even concedes that Winston's "familiar[ity] with bank fraud, wire fraud and mail fraud from his involvement in the First United scheme" aided him in knowing how to orchestrate the Winhaven Fraud. (Amend. Compl., ¶ 72.) Further, of importance, the Plaintiff even admits that the indictment accused Winston of "making '*materially false and misleading statements*' to unwitting investors *to induce them* to purchase or sell securities." (Amend. Compl., ¶ 15, emphasis added.) This is very similar in nature to the behavior that the Plaintiff accuses here – that is, that Winston made materially false and misleading statements to her in order to induce her to trust him with her finances, provide him loans on real estate investments and to sign blank documents.

Nonetheless, while Winston's criminal case was still pending, in the fall of 2003, the Plaintiff agreed to have Winston manage all her financial affairs, including her checking account, securities and brokerage accounts and the Credit Line. The Court finds it particularly alarming that the Plaintiff would trust Winston with her securities and brokerage accounts, considering that Winston at the time was facing charges for securities fraud. The Plaintiff also permitted Winston to collect her mail and wind down WorldWide, as well as hired Ganz as her accountant at Winston's urging. Although the Plaintiff suggests that she was bamboozled into trusting Winston due to the fact that he was her son-in-law and based on his assurances that he was innocent and had her best interests at heart, the standard the Court must apply is not a subjective one but, rather, an objective one. In this regard, the Court finds that while inquiry notice may not have yet been triggered at this point, a person of reasonable intelligence would have at least been suspicious that Winston was so eager to take control of her finances, given the above criminal charges.

However, in 2005 Winston *pled guilty* to conspiracy to commit securities fraud and conspiracy to commit money laundering, thereby undercutting his previous representations to the Plaintiff that he was innocent. As a result of his conviction, he was sentenced to ten years of probation and order to pay more than $108 million in restitution, all of which was publically available knowledge. While the Plaintiff argues that she did not understand the meaning of the Plaintiff's conviction and sentence, again, the standard is an objective one. At this point, a person of reasonable intelligence would have begun to inquire about the state of her finances in light of the fact that the person she had entrusted to oversee them had just pled guilty to a felony involving securities fraud and money laundering, resulting in a ten-year probation sentence and a hefty restitution order. See Lenz, 833 F. Supp. at 375 ("[A]wareness of other . . . criminal fraud

convictions involving a defendant puts a plaintiff on inquiry notice of the probability of fraud within another transaction involving the defendant.").  If she had done so, she would have discovered the eight alleged unauthorized advances that Winston, Ganz and Tehrani had withdrawn from the Credit Line.  The Court also notes that despite the Plaintiff's implication that she was "unaccustomed to the American justice system" (Amed. Compl., ¶ 51.), she was, in fact, no stranger to the United States; indeed, she had relocated to New York in 1973 and became a United States citizen in 1984, more than 20 years before Winston's conviction.

The Court pauses here to acknowledge the Plaintiff's reliance on <u>Dietrich v. Bauer</u>, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999), for the proposition that "mere awareness of a criminal fraud conviction is not sufficient to put a plaintiff on inquiry notice of the probability of fraud in other areas."  (Pl. Mem. Opp. to Winston's Motion to Dismiss, pg. 12.)   However, the court in <u>Dietrich</u> actually stated that "there is no absolute rule in the Second Circuit that *the filing* of a lawsuit *alleging fraud* against a defendant is sufficient to place a plaintiff on inquiry notice of other fraudulent acts by the same defendant."  <u>Dietrich</u>, 76 F. Supp. 2d at 345 (emphasis added). In this Court's view, <u>Dietrich</u> is inapposite to the present case, because allegations of fraud in a lawsuit, which had yet to be litigated, are distinct from a criminal fraud conviction resulting from a guilty plea.  Indeed, in this case, Winston admitted to his crimes and received a sentence and a restitution order against him as a result.  Therefore, by 2005, it would have been clear to the Plaintiff not only that Winston had previously engaged in fraudulent conduct for financial gain, but also that he had lied to her about his innocence when he was originally indicted.

Despite this, in 2006, the Plaintiff then agreed to loan Winston $6,000,000 from the Credit Line for the Fields real estate investment.  Unfathomably, after she made the $6,000,000 Fields Loan, the Plaintiff did not find it odd that she was never contacted by HSBC Bank

concerning the Credit Line, even though the $6,000,000 advance would have caused the Credit Line – which had a $6,500,000 limit – to be nearly drawn to its maximum. While the Plaintiff insists that she was not aware that she was supposed to receive account statements for the Credit Line because Lorber had always received them previously, a person of ordinary intelligence would have realized that she should have been receiving account statements on a multi-million dollar Credit Line that was drawn near its maximum. If she had inquired of HSBC Bank regarding this, she would have learned about the alleged abuse of the Credit Line by Winston, Tehrani and Ganz.

Finally, the Plaintiff readily admits that in 2006 and 2007, Winston and Ganz approached her to sign *blank* documents. According to the Plaintiff, Winston and Ganz deceived her into believing that these documents were required by HSBC Bank in order to extend Winston's time to repay the 2006 Fields Loan that the Plaintiff had given him. However, given the totality of the circumstances, if a person of normal intelligence was asked to sign blank documents in connection with her multi-million dollar credit line that she was receiving no account statements for by a man who had recently pled guilty to crimes that involved engaging in fraudulent conduct for financial gain, she would be on alert of the probability of fraud. Staehr, 547 F.3d at 427 (holding that "a totality-of-the-circumstances analysis applies" when deciding the issue of inquiry notice under the objective standard).

A plaintiff cannot bury her head in the sand. Indeed, to allow a plaintiff to do so would be to ignore one of the primary purposes behind Congress's enactment of the civil RICO statute, as articulated by the Supreme Court in Rotella:

> The object of civil RICO is [ ] not merely to compensate
> victims but to turn them into prosecutors, private attorneys general,
> dedicated to eliminating racketeering activity. The provision for
> treble damages is accordingly justified by the expected benefit of

> suppressing racketeering activity, an object pursued the sooner the
> better. It would, accordingly, be strange to provide an unusually
> long basic limitations period that could only have the effect of
> postponing whatever public benefit civil RICO might realize.

528 U.S. at 557–58 (citations and internal quotation marks omitted). In this case, if the Plaintiff

had investigated when she was presented with the abovementioned clear storm warnings, she

would have discovered the alleged Winhaven Fraud. Neither her "generosity" nor her "naïveté"

is an excuse for her lack of due diligence. (Amend. Compl., ¶ 90.)

Relevant here is the Second Circuit's decision in Dodds v. Cigna Securities, Inc., 12 F.3d

346 (2d Cir. 1993). In that case, the plaintiff, a 45-year old widow with a tenth-grade education,

was an investor who alleged that the defendants, "in order to make higher commissions, induced

her to invest in limited partnerships that were unsuitable for her because of their risk and

illiquidity." Id. at 347, 350. However, the Second Circuit found, as a matter of law, that her

action was time-barred on the basis of inquiry notice, because "the commissions, the risk, and the

illiquidity of investments in the limited partnerships were clearly disclosed in the prospectuses"

that she was provided several weeks before invested. Id. Notably, because the Second Circuit

was required to apply the objective standard, in its analysis it did not discuss the plaintiff's level

of education or the fact that she had no involvement in her family's financial affairs or

investment decisions before her husband's death. Id. at 347, 350.

While the Court acknowledges that there may not be a smoking gun present here akin to

the prospectuses in the Dodds case, the Court still finds the Dodds court's reasoning applicable

to this case. First, as in Dodds, the Plaintiff's education or lack of involvement in her family's

financial affairs before Lorber's death may not factor into the Court's analysis. What's more, as

outlined above, the Court finds that the Amended Complaint contains sufficient facts that would

have served as storm warnings to the Plaintiff that she was being defrauded, even if these storm

warnings were not perhaps as explicit as the prospectuses at issue in <u>Dodds</u>.  Similar to the

<u>Dodds</u> plaintiff, who could not be bothered to read the prospectuses, the Plaintiff in this case

chose to sign blank documents without reading them and to lend $6,000,000 from her Credit

Line without monitoring it.  Indeed, the Court finds no allegation in the Amended Complaint that

the Plaintiff was prevented from inquiring about the state of the Credit Line.  <u>Id.</u> at 352 ("There

is no allegation that defendants prevented or discouraged [the plaintiff] from reviewing the

prospectuses that were provided to her several weeks before she invested in the limited

partnerships.").  Simply put, the Plaintiff, like the Dodds plaintiff, turned a blind eye to the storm

warnings and essentially relied on the assurances of others.

To the extent the Plaintiff tries to save her RICO claim by suggesting that fraudulent

concealment tolls the statute of limitations, the Court finds that her argument is without merit.

As stated above, "[u]nder the doctrine of fraudulent concealment, the Court may toll the

limitations period if the plaintiff establishes that: '(1) the defendant wrongfully concealed

material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's

discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due

diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.'"

<u>Milo v. Galante</u>, 3:09CV1389 JBA, 2011 WL 1214769, at *5 (D. Conn. Mar. 28, 2011) (quoting

<u>Corcoran v. N.Y. Power Auth.</u>, 202 F.3d 530, 543 (2d Cir. 1999)).  "In order to meet her burden,

a plaintiff must plead the elements of fraudulent concealment with particularity in accordance

with [Fed. R. Civ. P.] 9(b)[.]"  <u>Id.</u> (citing <u>Chien v. Skystar Bio Pharm. Co.</u>, 623 F.Supp.2d 255,

265 (D. Conn. 2009), and <u>Butala v. Agashiwala</u>, 916 F. Supp. 314, 319 (S.D.N.Y. 1996)); <u>see

also</u> <u>Am. Med. Ass'n  v. United Healthcare Corp.</u>, 00CIV2800LMM, 2006 WL 3833440, at *11

(S.D.N.Y. Dec. 29, 2006) (citing <u>Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.</u>, 404 F.3d

566 (2d Cir. 2005) (per curiam )) ("Allegations of fraudulent concealment, like other allegations of fraud, must be pleaded with particularity in accordance with Fed. R. Civ. P. 9(b).").

Here the Court finds that the Plaintiff failed to comply with Rule 9(b), because she does not "'adequately specify the statements [she] claims were false or misleading, give particulars as to the respect in which [she] contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" Id. (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). For example, the Plaintiff alleges that Winston hoodwinked her into hiring Ganz as her accountant in order to gain unlimited access to the Plaintiff's personal and financial information. However, the Amended Complaint provides no details as to the exact statements Winston made to convince her or how the statements were false or misleading. Nor does she state when or where those statements were made beyond that they apparently occurred "sometime in 2004." (Amend Compl., ¶ 76.) Accordingly, the Plaintiff's allegation is insufficient to satisfy the pleading requirements of Rule 9(b). See Maimsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 665 (S.D.N.Y. 2007) (where the plaintiff alleged the defendant "failed to inform him that money was being diverted and . . . concealed the diversions in return for being allowed to pay himself as he pleased," finding said allegations to be insufficient to satisfy the pleading requirements of Rule 9(b) because the plaintiff failed to "specifically identify statements made to him by [the defendant] that failed to mention the diversions . . ., that misled him, and upon which he relied").

Similarly, as another example of how Winston, Tehrani and Ganz concealed the fraud, the Plaintiff points to her assertion in the Amended Complaint that "[u]pon information and belief, between April 2006 and June 2011, . . . Winston and his co-conspirators advanced [ ] funds [from the Credit Line] by forging [the Plaintiff's] signature on advance requests and other

related documents, or by obtaining [the Plaintiff's] signature through fraud and deceit by misrepresenting the nature and purpose of the documents she was to sign." (Amend. Compl., ¶ 102.) However, the Amended Complaint alleges no other particulars to support this accusation, including (1) when Winston Tehrani and Ganz forged the advanced requests and other related documents or else fraudulently induced the Plaintiff to sign the documents; (2) the precise nature of the advance requests and the other related documents at issue; and (3) with respect to those documents that the Plaintiff signed, what specific misrepresentations were made to the Plaintiff and in what way were they fraudulent. Thus, the Plaintiff's "conclusory statements are insufficient for the purposes of Rule 9(b)." Dennany v. Knights of Columbus, 3:10CV1961 SRU, 2011 WL 3490039, at *8 (D. Conn. Aug. 10, 2011) (citing OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp., 503 F. Supp. 2d 490, 508 (D. Conn. 2007)).

What's more, even assuming that Winston, Tehrani and Ganz concealed the Winhaven Fraud, the Plaintiff has still failed to satisfy the third element of fraudulent concealment – namely, that her continued ignorance was not attributable to a lack of diligence on her part. See Maine Street Associates, 179 F. Supp. 2d at 346. As already discussed above, the Plaintiff decided to rely on assurances from Winston rather than to perform due diligence to monitor her own financial affairs. As the Second Circuit has explained, "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if [a person] of ordinary intelligence would reasonably rely on the statements to allay the [person's] concern." LC Capital Partners, 318 F. 3d at 155.

Here, the Plaintiff did not act reasonably in relying on the statements from Winston and Ganz, because (1) Winston had a criminal fraud conviction, which he had previously lied to her

about; (2) even though she had agreed to advance $6,000,000 from the Credit Line to Winston, she never received any communications from HSBC Bank for years regarding the Credit Line; and (3) Winston and Ganz asked her to sign blank documents.  In addition, the Plaintiff's contention that she exercised due diligence by reviewing her monthly account statements for her Collateral Account is unavailing, because she lent the $6,000,000 Fields Loan from the Credit Line, not the Collateral Account.  Indeed, the fact that she was receiving monthly account statements for the Collateral Account but not the Credit Line that she had loaned $6,000,000 from, should have suggested to her that something was amiss.

Finally, the Court finds that the separate accrual rule is inapplicable to this case.  Under the separate accrual rule, each time a plaintiff discovers or should have discovered a new and independent injury caused by a civil RICO violation, a new cause of action arises as to that injury.  See Merrill Lynch Ltd. Partnerships Litigation, 154 F.3d 56, 59 (2d Cir. 1998); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1105 (2d Cir. 1988).  In this regard, "in some instances a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries which each have separate limitations periods."  Merrill Lynch Ltd., 154 F.3d at 59.  However, "the injury ha[s] to be new and independent to be actionable."  Id.

Instructive here is the Second Circuit's decision in Merrill Lynch Ltd.  In the Merrill Lynch Ltd. case, the plaintiffs were investors in real estate limited partnerships who brought a civil RICO claim alleging that the defendant made fraudulent representations and omissions to induce investors to invest in the partnerships.  Id. at 57–58.  The Second Circuit found that the separate accrual rule did not apply because the plaintiffs alleged that the defendant's "scheme was fraudulent at the outset," in that the Defendant "knew that the investments could not make the 'guaranteed' gains, and planned to collect significant fees during the course of the

partnership life." Id. at 69. As such, the Defendant's "later communications which put a gloss on the losing investments were" deemed by the Second Circuit to be "continuing efforts to conceal the initial fraud, and not separate and distinct fraudulent acts resulting in new and independent injuries." Id. at 59–60.

Likewise, in the present case, the Plaintiff alleges one singular scheme – the Winhaven Fraud – which was fraudulent at the outset. In this regard, the Amended Complaint asserts that Winston, Tehrani and Ganz fraudulently gained access to the Credit Line in 2004 in order to defraud the Plaintiff. Thus, any advances that were taken from the Credit Line, including those from after 2008, simply followed from the execution of that scheme. See, e.g., Eno Farms Co-op. Ass'n., Inc. v. Corp. For Indep. Living, CIV. 3:06CV1983AHN, 2007 WL 3308016, at *9 (D. Conn. Nov. 5, 2007) ("The defendants allegedly created the project for the purpose of defrauding the plaintiffs with false promises of home ownership. Any subsequent injuries – the loss of carrying charges, tax credits, and unit appreciation – follow from the execution of that scheme[.]"). Moreover, the Plaintiff concedes that she was fraudulently induced into agreeing to the $6,000,000 Fields Loan from the Credit Line in 2006. As such, those Credit Line advances that followed this loan agreement cannot be said to be separate injuries, as they stemmed from the Fields Loan.

In her opposition papers, the Plaintiff relies on Bingham v. Zolt, 66 F. 3d 553 (2d Cir. 1995). However, that reliance is misplaced. This is because in the Bingham case "[a] *variety of schemes* were employed, involving frequent misappropriations of discrete amounts of money from *different sources*[.]" Id. at 561 (emphasis added). These schemes included "The Share Transfer Scheme"; "The Almo Scheme"; "The Island Assignment Scheme"; and "the Rondor Scheme." Id. at 557. Conversely, in this case there was *only one scheme*, the Winhaven Fraud,

of which, as the Plaintiff essentially admits, "the *misuse of the [C]redit [L]ine [wa]s the centerpiece*[.]" (Pl. Opp. to Tehrani's Motion to Dismiss, pg. 13, emphasis added.)

Accordingly, even construing the facts in the light most favorable to the Plaintiff, the Court must find that the Plaintiff was on inquiry notice beginning in 2006. As such, given that the statute of limitations to bring a civil RICO case is four years, her civil RICO claim is time-barred.

## E.  As to Whether the Plaintiff Complied with the Requirements of Fed. R. Civ. P. 9(b)

Even assuming that the Plaintiff's civil RICO claim was not time-barred, the Plaintiff's claim would still fail because the Plaintiff failed to plead the circumstances constituting the fraudulent predicate acts with the particularity required by Fed. R. Civ. P. 9(b). Indeed, while the Plaintiff in her Amended Complaint identifies Ganz and/or Winston as the fraudulent speaker(s), she fails to "specify the statements that the [P]laintiff contends were fraudulent," "state where and when the statements were made," or "explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).

As already detailed above, the Plaintiff's accusation that Winston recommended that Plaintiff hire Ganz as her accountant so that he could gain unfettered access to her finances is merely conclusory and contains no specifics with respect to what exactly was said, who was present or when and where the exchange occurred. In the same vein, also explained above, the Plaintiff's allegation that Winston, Tehrani and Ganz forged documents or fraudulently induced the Plaintiff to sign documents in connection with the Credit Line is insufficient without details as to what documents were forged, when and where the forgeries and/or fraudulent inducement occurred or what exact misrepresentations were made to the Plaintiff to induce her to sign the documents. See Leung v. Law, 387 F. Supp. 2d 105, 114 (E.D.N.Y. 2005) (where the complaint

failed to "identif[y] specific statements which [we]re alleged to have been fraudulent" and only "name[d] whole documents, each of which encompasse[d] numerous discrete statements, and allege[d], in vague and sweeping language, that each of these documents contained one or more false statements," holding that "[t]hese blanket accusations are clearly insufficient to meet the particularity requirement of Rule 9(b)").

The Plaintiff's other allegations similarly lack any particulars, despite the requirements of Fed. R. Civ. P. 9(b). For example, with respect to Winston and Ganz's allegedly misleading and damaging advice regarding the IRA Account and Collateral Account, the Plaintiff does not provide the date, time, place, or content of the alleged misrepresentations. In this regard, she alleges that "from 2008 to 2010, Winston and Ganz advised [the Plaintiff] . . . that she should leave the Collateral Account untouched so that it could grow, rather than divide the account into various trusts for her children and grandchildren as [the Plaintiff] wanted to do. Winston and Ganz falsely advised [the Plaintiff] that the nature of the investments in her Collateral Account was such that the investments would provide the same growth and benefit if placed into several different accounts." (Amend Compl., ¶ 120.) She further alleges that "at times when [the Plaintiff] required additional money, Ganz advised her to sell securities in her IRA Account rather than her Collateral Account because the tax consequences from withdrawing funds from the Collateral Account would be significant. . . . Ganz knowingly misrepresented the consequences of withdrawing funds from [the] IRA Account versus [the] Collateral Account, and, in reality, the consequences of withdrawing funds from [the] IRA Account were much worse." (Amend. Compl., ¶ 122.) Although the Plaintiff's assertions arguably touch upon the nature of Winston and Ganz's alleged misrepresentations, the Plaintiff still does not point to

what specific statements Ganz and Winston made to her or when or where the discussions occurred.

Further, the Court finds that the Plaintiff's claims that Winston, Ganz and Tehrani committed the predicate acts of mail fraud and wire fraud to be insufficient. As the court in Bernstein v. Misk, 948 F. Supp. 228 (E.D.N.Y. 1997) explained:

> A claim of mail or wire fraud must specify the content, date and place of any alleged misrepresentations and the identity of the persons making them. Wexner v. First Manhattan Co., 902 F.2d 169, 172–73 (2d Cir. 1990). See also Official Publications, Inc. v. Kable News Co., 692 F. Supp. 239, 245 (S.D.N.Y. 1988) (In alleging mail fraud, plaintiff must set forth "the content of the items mailed and specify how each of the items was false and misleading."), aff'd in part and rev'd in part, 884 F.2d 664 (2d Cir. 1989); Qantel Corp. v. Niemuller, 771 F. Supp. 1361, 1369 (S.D.N.Y. 1991) (to plead wire fraud with particularity, plaintiff must identify number of telephone calls that were made and dates on which they were made).

Id. at 239. Here, the Plaintiff's "mail fraud claims are insufficient because [it appears] there are no [specific] facts in the body of the [Amended] [C]omplaint that refer to use of the mails in connection with the fraudulent scheme." Id. Further, the Plaintiff's "wire fraud predicates cannot stand" either, because "those statements [in the Amended Complaint] that refer to the use of the telephones or wires do not contain "allegations of the number of calls made, the time or place of the calls, who placed them and who received them." Id.

Even the Plaintiff's fraud claim in connection with the Fields Loan is not sufficiently particularized to comply with Fed. R. Civ. P. 9(b). Although the Plaintiff does refer to the statements made by Winston to obtain the Fields Loan, absent are allegations of time and place. While the Plaintiff asserts generally that Winston approached the Plaintiff about the Fields Loan "sometime in early 2006" (Amend. Compl., ¶ 83), it is unclear from the Amended Complaint if his statements were made over a series of conversations or if they were made during one single

exchange between the Plaintiff and Winston. Moreover, there are no allegations with respect to where Winston made these statements to the Plaintiff. See Kubin v. Miller, 801 F. Supp. 1101, 1117 (S.D.N.Y. 1992) ("Upon review of the complaint, the Court finds that [the plaintiff] has failed to plead fraud with the requisite particularity. Although the complaint contains various references to statements made by [the defendant], [the plaintiff] has failed to specify either the time or place of each of [the defendant's] alleged statements.").

Thus, the Court finds that these generalized allegations, without more, do not comply with Rule 9(b)'s requirements. As such, the Plaintiff's civil RICO claims fail on this basis, as well. See Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)) ("As to particularity, the 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which [the] plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' Bare-bones allegations do not satisfy Rule 9(b)"); Newby v. Bank of Am. Corp., 12-CV-614 SJF AKT, 2013 WL 940943, at *8 (E.D.N.Y. Mar. 8, 2013) ("[G]eneral and conclusory allegations fail to satisfy Rule 9(b)'s requirement that predicate acts of fraud be pleaded with particularity."); Physicians Mut. Ins. Co. v. Greystone Servicing Corp., No. 07–CV–10490, 2009 WL 855648, at *9 (S.D.N.Y. March 25, 2009) ("[P]laintiffs' RICO claims also fail because the alleged predicate acts are pleaded too vaguely to satisfy Rule 9(b)'s particularity requirements.").

While the Court, in its discretion, may grant a plaintiff who has failed to comply with Fed. R. Civ. P. 9(b) an opportunity to file an amended complaint, given that the Court has already determined that the civil RICO claim is time-barred, the Court declines to do so. See Gee Chan Choi v. Jeong-Wha Kim, 04-CV-4693, 2006 WL 3535931, at *11 (E.D.N.Y. Dec. 7,

2006) (citations omitted) ("Although courts have the discretion to permit parties to amend their pleadings to correct initial pleading deficiencies, leave may be denied where repleading would be futile.").

## F.  As to Whether this Court will Exercise Supplemental Jurisdiction Over the Plaintiff's Remaining State Law Claims

As this Court has found the Plaintiff's civil RICO claim to be barred by the statute of limitations, the only remaining causes of action in this case allege state law claims.   However, a court "may decline to exercise supplemental jurisdiction over a [pendent state law] claim" if the court "has dismissed all [federal] claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Once [a court's] discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity in deciding whether to exercise jurisdiction."  Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (internal citation and quotation marks omitted).

Having dismissed the Plaintiff's only federal claim, and given the early stage of this litigation, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Indeed, the only grounds that the Plaintiff argues for this Court retaining jurisdiction over her state law claims is that the "Defendant Winston has, for years, been gallivanting around as a real estate mogul, enjoying the use of a multi-million dollar yacht as well as other luxuries, despite failing to fully satisfy the $108,988,825.50 restitution judgment levied against him by a court in this very district."  (Pl. Opp. to Winston's Motion to Dismiss, pg. 18–20.)  This Court does not view this as a sufficient reason for it to continue exercising jurisdiction now that the Plaintiff's civil RICO claim has been dismissed.  Accordingly, the motions to dismiss the Plaintiff's state law claims is granted without prejudice.  See Harrell v. Primedia, Inc., 02 CV 2893 (JSM), 2003 WL 21804840, at *3 (S.D.N.Y. Aug. 6, 2003) (holding where the "[p]laintiffs'

RICO claims, which provide the only basis for federal jurisdiction, must be dismissed" that "[t]here is no reason for the [c]ourt to exercise its discretion to retain jurisdiction over [p]laintiffs' state law claims").

## IV. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Plaintiff's civil RICO claim is time-barred and, therefore, dismissed with prejudice, and it is further

**ORDERED**, that the Plaintiff's remaining state law claims are dismissed without prejudice; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.


**SO ORDERED.**
Dated: Central Islip, New York
July 3, 2013


_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge